Per Curiam.

If we were bound by the rules of the Court of Chancery in England, the plaintiffs would not be entitled to a hearing at this time. There, when a cause is set down for hearing, a subpoena to hear judgment is to be served upon the adverse party ten days before the day of hearing, if he lives within twenty miles of London, and fourteen days, if beyond that distance.
But these rules are not in force here. We have not adopted them formally, and there has been no usage from which their adoption might be inferred. It has been an object with us to simplify chancery practice ; which can be effected only by avoiding too much regulation. We require only that proper notice shall be given, according to the exigency of the case; so as to hasten the proceedings as much as possible, without prejudice to a party for want of time. The construction given by the counsel for the defendants, to the 1st of our rules, is superseded by the 7th rule. Notice, as therein mentioned, being given thirty days before the ensuing term, a case in chan eery stands for hearing like any other case, and is subject to motions like other cases. The case before us comes within the equity of this rule.
The Court further remarked, that it was not necessary to have a particular rule for the publication of testimony. The filing and opening of depositions in the clerk’s office is equivalent to a publication. They will be on the files and open to the inspection of the parties.
The defendants afterward claimed “ the right secured to *370 them by the constitution of this Commonwealth, of a trial by jury of the whole matters in controversy, it never having been, before the adoption of the constitution, otherwise used or prac* tised in this Commonwealth in such cases ; and they deny that the legislature have the power to take from them the right to such general trial, or to authorize the Court to select particular facts and direct issues thereon.” They designated several points as indispensably requiring the intervention of the jury.
Fletcher and Aylwin rested this claim,
as a matter of right, on the 15th article of the declaration of rights ; which provides, “that in all controversies concerning property, and in all suits between two or more persons, except in cases in which it has heretofore been otherwise used and practised, the parties have a right to a trial by a jury ; and this method of procedure shall be held sacred, unless, in causes arising on the high seas, and such as relate to mariners’ wages, the legislature shall hereafter find it necessary to alter it.”
But as a matter of discretion, the Court would refer these questions to a jury. Even in England, where undoubtedly the chancellor may determine the facts, the power is exercised “very tenderly and sparingly.” St. Paul’s v. Morris, 9 Ves. 168 ; 2 Madd. Ch. Pr. 364.
Webster and Shaw, contra.
In cases in which, before the adoption of the constitution, chancery jurisdiction was given to this Court, the whole power of an English court of chancery was exercised. There was no trial by jury, as a matter of right; so that cases in chancery are within the exception in the declaration of rights. Thus, in chancering the penalty of a bond, after forfeiture confessed or found, the Court determined the facts ; as the fact of payment, &c. ; though they might, in their discretion, direct such facts to be determined by a jury.
If the defendants could, as a matter of right, deny the bill generally, and have a trial by jury, this claim should have been made' sooner. By answering, they have waived the right. In chancery the court get the facts from the party himself, and if he is compelled to be a witness himself, the trial by jury, in the common understanding of the terms, is taken away.
This is a motion, before a hearing, for issues to try matters *371 of fact. It is a question of practice merely, and does not involve a consideration of the construction to be given to the declaration of rights. There is nothing in the English practice, of having a hearing before issues are directed, that is inconsistent either with the constitution or with our own practice. The usual course, in an equity suit, is to hear the pleadings and evidence, and observations upon them, and then, if the court see fit, to direct an issue. This is always done by an interlocutory decree upon the hearing, and is a matter of discretion. The decree states what facts shall be admitted and what evidence shall be received, with other particulars relating to the trial. 2 Madd. Ch. Pr. 963 ; 1 Newl. Ch. Pr. 350; 1 Grant’s Ch. Pr. 210; 2 Anstruth. Rep. 480; 2 Fowler’s Exch. Pr. 194 ; Dale v. Roosevelt, 6 Johns. Ch. R. 255 ; Le Guen v. Gouverneur, 1 Johns. Cas. 436. There are but two courses to be pursued ; the Court must either hear the case, and ascertain that there is a substantial controversy in respect to an important fact which should be determined by a jury, or they must refer the whole case to the jury, making them chancellors under the guidance of the Court.
Fletcher, in reply,
said that every thing that is desirable in a court of chancery, may be obtained, without violating the constitution. 3 Bl. Com. 381. Although before the constitution was adopted, certain cases in chancery may have been heard without a jury, it does not follow that the legislature may withdraw from a jury all cases which are subsequently made matters of chancery jurisdiction.

Webster.

Cases, in the 15th article, means classes of cases, and cases in chancery composed one of those classes.

Fletcher.

It is said we have waived our right to a trial by jury, by filing an answer We claim it in the answer itself. Had we previously insisted on such trial, there would have been no issue for the jury. We have a justification; must we not plead it ? If not, what have we to try ? The rules in England are not applicable here in their full extent, but the Court regard the spir t of them as affected by our laws. There, the chancellor, having power to determine the facts, directs an issue of his own motion and to satisfy his conscience, and he must hear the cause first; here, the party claims a trial by jury as secured to *372 him by the constitution. The Court can examine the pleadings and the suggestions of the parties, to see if there are any, and if any, what questions to be tried by a jury. [Parker C. J. Suppose issues shall be framed on all the questions in your motion ; both parties have taken testimony in writing ; when you go before a jury, is all this evidence to be received, some of which is different from the evidence commonly used in jury trials ?] That is a question to be determined at the trial. It is not inconsistent with a trial by jury, to put a party on his oath. Our statutes provide for it already in some cases.

June 16th.

Webster insisted,
that the proper time for the defendants to demand a trial by jury, was upon the rule to file an answer. They ought then to have objected to putting in an answer. Answering with a protestando is the same thing as answering without one, and is a waiver of a trial by jury as a matter of right.
Parker C. J.
delivered the opinion of the Court. We are brought to the consideration of a question of high importance to the partial and limited system of equity established by the legislature, with very little time and opportunity to give it the attention it deserves. It is one of the most obvious disadvantages o, the present mode of administering the power, that those who are charged with it are, by incessant engagements in the ordinary course of their functions, rendered in a measure disqualified for the exercise of duties, which, to be well discharged, require the undivided application of a single mind. We however must submit to the ordinances of higher powers, and be content with discharging our duty honestly, until the legislature, in their wisdom, shall see fit to make a better disposition of this branch of judicial power.
The question proposed, in its broadest terms, strikes at the root of a system of equity in this Commonwealth, as hitherto administered ; for if, upon a bill in chancery, the respondent has a right to claim that the whole case shall be tried by jury, t is obvious that these cases are brought back again to common law jurisdiction, with some increase of power in the Court, and some change in the form of trial, but with little of the character of chancery proceedings as practised in England, in the Courts of the United States, or of any of the States which have es *373 .ablished such a system. Whether this would be an improvement or not, we are not prepared to say ; but it would be clearly contrary to the declared intention of several successive legislatures since the year 1818, when the first statute was enacted giving to the Court jurisdiction in matters of equity ; for in that, a:.d in all the statutes since passed, though the subjects referred to the Court are specific, the authority over them is as unlimited as the Lord Chancellor in England possesses, for we are referred to the rules and proceedings in chancery, as the guide and only limitation of our authority.
The motion now made is for a trial by jury, and it is insisted on as a right secured by the declaration of rights, prefixed to the constitution and malting a part thereof.
The article relied on is in no ambiguous language ; nothing could more explicitly declare the intention of the people, that with the exceptions therein contained, the right to trial by jury should never be invaded. Now the case presented by this bill is a controversy concerning property, and it is also a suit between parties ; so that unless it is a case in which, at the time of the adoption of the constitution, a different mode of trial could be said to have been practised, it is most clearly included in the article. But we wish not to decide this question now, believing it not to be necessary, and that further time might enable us to show that the case comes within the practice. We find that the colonial legislature, in the year 1685, vested in the county courts as ample jurisdiction in matters of equity, as exists in the Courts of Chancery in England. That statute continued in force until the grant of the provincial charter in 1691, by which the colonial statute was probably considered to be repealed. After the charter, in 1692, the whole chancery power was vested in the governor and eight of the council, with a power to delegate it to a chancellor to be appointed by the gov- ? -nor. The next year the legislature, declaring that this mode of administering the power was found in practice to be inconvenient, repealed the law, and transferred the power to three commissioners ; and in the succeeding year this tribunal was superseded, and a high court of chancery was established. We have it from tradition, and I have seen it somewhere in history, that these several acts became null and void by reason of the nega *374 five of the king, which was exercised according to the charter, within three years after their enactment; they were however in force, according to the provisions of the charter, until the veto of the king was made known to the constituted authorities here, Now whether the framers of the constitution, and the people, had reference to those former chancery tribunals, when they adopted the exception to the general provision in the 15th article, may admit of question ; we are inclined to think, however, that the word “ heretofore,” in the exception, coull hardly he applicable to a practice which had ceased to exist neat .y a century before the constitution was adopted. In regard to probate cases, and suits for redemption of mortgages, the practice of trying facts by the court instead of the jury, had continued down to the adoption of the constitution. But we say again, that we do not wish to decide this question now, any further than to declare, that a reasonable construction of the 15th article does not require that a suit in chancery shall be tried just as a suit at common law would be, and that there is no necessity that the whole case shall be put to the jury. The most that can be made of tire article is, that all controverted facts deemed essential to the fair and full trial of the case, shall be passed upon by the jury, if the parties or either of them require it. And whether the facts proposed to be so tried are essential or not, must of necessity be determined by the Court. There may be many facts stated in a bill and denied in an answer, and also facts alleged in the answer, which are wholly immaterial to the merits of the case, and such facts the court may refuse to put to the jury ; just as in an action at common law, if a party offers to prove facts which are irrelevant, the court may reject the proof; and as immaterial issues, even after verdict, may be rejected as nugatory. The right of the party to go to the jury is preserved, if he is allowed that course in regard to all such facts as have a bearing upon the issue for trial.
But it is objected, that according to the course of proceeding in chancery the motion is premature, because an issue can be directed only on a hearing, for it cannot be determined of what facts the issues shall consist, un‘il after a hearing shall have *375 taken place, and the evidence is looked at which is adduced in support of the facts.
If it were true, that issues to the country should be ordered only when the court, on inspecting the evidence, found a difficulty in deciding the fact, this position would be maintained ; but certainly a full hearing is not necessary in order to come to the result; for if by inspecting the bill and answer it should be perceived that there are important facts asserted and denied, we do not see why issues may not be directed as soon as the court shall determine, in their discretion, that those facts shall be so ascertained : and certainly much time may be saved by this course of proceeding. Now in exercising discretion upon an application for an issue, the Court cannot but have some regard to the expression of the public will in the declaration of rights on this subject of a trial by jury, so as more carefully to preserve the general principle, although they may doubt of the existence of aright. This Court cannot be desirous of enlarging its jurisdiction, or of assuming the trial of facts in any case, and certainly not in the exercise of a jurisdiction reluctantly given by the legislature and by no means coveted by us. In most cases therefore, when a trial by jury shall be asked for, it will probably be granted, unless it shall manifestly appear that the object of pursuing that course, in the party applying, is to delay or embarrass the cause by putting to the jury issues wholly immaterial. If however it is still insisted, that a hearing to some extent should be first had, in order to understand the pertinency of the facts sought to be tried, we will hear counsel further upon that point.
We have looked over the numerous points selected by the counsel as proper subjects of an issue, and compared them with the bill and answer, and are satisfied that some of them are of a character suitable for the jury, if the party requires it, though in regard to most of them the evidence will probably be of a nature to be judged of, in regard to its legal effect, by the court, rather than the jury ; such as statutes, records, &c., and in regard to these, it will be a matter of discretion in the counsel, whether, after all, atrial by jury will be of any use. There are other points suggested, which we deem wholly immaterial *376 to the rights of the parties and the decision of the cause, and these will not require an issue.
If a trial by jury shall be still claimed, we think it our duty to provide for such a trial as soon as possible. We can see no good reason for delay. The parties are at liberty, if they agree, to use the depositions which have been taken in the cause ; if they do not, they know the facts to be proved and the witness by whom it is expedient to prove them.
The Court proceeded to state which of the questions proposed by the defendants were proper to be tried by a juiy, and which were not; giving liberty however to counsel to object to the discrimination.
The St. 1791, c. 62, § 9, pro rides, “ that in consideration of the privileges in this act granted to the proprietors of Charles River bridge, the said proprietors shall relinquish the additional toll on the Lord’s day, from and after the passing of this act and one of the questions proposed to be submitted to a jury was, whether this provision had been complied with. The Court said, that this was not proper to be tried ; because the provision was only, a condition subsequent, the non-performance of which might be a ground of forfeiture upon proper process instituted by the government, but could not be taken advantage of by a stranger.
Another question was, whether the proprietors of Charles River bridge procured the extension of their charter by the act of 1791, by means of false suggestions and false and colorable representations to the legislature. This question, the Court said, was immaterial. If fraud was practised, the charter could be revoked only upon a process of quo warranto. As the corporation had been suffered to exist forty years, and had been found beneficial, the government might be willing to let it continue, even if an extension of the charter had been fraudulently obtained. The defendants cannot take advantage of the susposed false representations. A man passing over the bridge might as well refuse, on the same ground, to pay the toll. If the question had come up in an action On the case against the plaintiffs for a nuisance, it would have been considered irrelevant. Further, in the act incorporating the proprietors of the Warren bridge the charter of the plaintiffs is recognised, *377 end some indemnity is provided for them. So that the question of fraud must be thrown entirely out of the case.
After this opinion was given, the defendants waived their right to a trial by jury, and in October, 1829, the cause was heard upon the merits.
By the evidence it appeared, that at a court of assistants held at Boston November 9, 1630, it was ordered, “ that whosoever shall first give in his name to Mr. Governour, that he will undertake to set up a ferry betwixt Boston and Charlton, and shall begin the same at such time as Mr. Governour shall appoint, shall have Id. for every person, and Id. for every hundred weight of goods, he shall so transport.”
1631. “ Edward Converse hath undertaken to setup a ferry betwixt Boston and Charlestown, for which he is to have two pence for every single person, and one penny a piece if there be two or more.”
November 5, 1633. “ Mr. Richard Brown is allowed by the court to keep a ferry over Charles river against his house, and is to have two pence for every single person, he so transports, and one penny a piece if there be two or more.”
At the general court held at Newtown, May 6, 1635, “ it is ordered that there shall be a ferry set up on Boston side, by Wind-mill hill, to transport men to Charlton and Winnesimet, upon the same rates that the ferrymen at Charlton and Wenesemet transport men to Boston.”
November 2, 1637, the ferry between Boston and Charles-town is referred to the governor and treasurer, to let at 401. per annum, beginning the first of December, and from thence for three years.
Evidence was given of an instrument in the handwriting of governor Winthrop, with an apparently original signature of “ Edward Converse,” dated November 28, 1637, stating that “ the governour and treasurer, by order of the general court, did demise to Edward Converse the ferry between Boston and Charlestown, to have the sole transporting of passengers and cattle from one side to the other, for three years from the first day of the next month, for the yearly rent of forty pounds, &c. provided that he see it be well attended and furnished with sufficient boats, and that so soon as may be in the next spring, he *378 set up a convenient house on Boston side, and keep a boat there as need shall require ; and he is allowed to take his wonted fees, viz.” &c.
At a general court held September, 6, 1638, “ there is a ferry appointed from Boston to Winnetsemet, Noddle’s Island and the ships, — the person to be appointed by the magistrates of Boston.”
In an ordinance respecting Harvard College, to which in the edition of the laws published in 1672 are affixed the dates of 1636, 1640 and 1642, it is recited that “ there is a college, &c. for the encouragement whereof this court hath given the sum of four hundred pounds, and also the revenue of the ferry betwixt Charlestown and Boston.”
At a general court held October 7, 1640, “ the ferry between Boston and Charlestown is granted to the college.”
At a session in October, 1644, “ it is ordered, that the magistrates and deputies of the court, their passages over the ferries together with their necessary attendants shall be free, not paying any thing for it, except at such ferries as are appropriated to any, or are rented out and are out of the country’s hands, and there it is ordered that their passages shall be paid by the country.”
At a general court in 1646, in answer to the petition of James Heyden, with his partners, ferrymen of Charlestown, it is declared, that by u necessary attendants ” in the last order, is meant a man and a horse, and not the families of the magistrates or deputies.
Harvard College was made a corporation in May, 1650.
At a general court held October 15, 1650, “ in answer to the petition of Henry Dunster, president of Harvard College, respecting the hundred pounds due from the country to the college, and rectifying the ferry-rent, which belongs to the college,” it is ordered, that “ when the lease is expired, it shall be in the liberty and power of the president, in behalf and for the behoof of the college, to dispose of the said ferry by lease, or otherwise making the best and most advantage thereof to his own content, so as such he dispos eth it unto perform the service and keep sufficient boats for the use thereof as the order of court requires.”
*379 In October, 1654, the general court, reciting, that “at present the work of the college hath been several ways obstructed, and seems yet also at present for want of comfortable maintenance for the encouragement of a president,” and “fearing lest we should show ourselves ungrateful to God, or unfaithful to posterity, if so good a seminary of knowledge and virtue should fall to the ground through any neglect of ours,” — order, “ that (besides the profit of the ferry formerly granted to the college, which shall be continued) there shall be yearly levied by addition to the country rate, one hundred pounds, to be paid by the treasurer of the country to the college treasurer, &c. and this to continue during the pleasure of the country.”
At a general court in May, 1655, “in answer to the petition of Mr. Charles Chancey, president of Harvard College, &c. the treasurer is desired to disburse the sum of 30L to furnish his necessary occasions, to be repaid out of the first rent of the ferry.”
By Prov. St. 6 W. fy M. c. 6, (Anc. Charters &c. 280,) “ for regulating ferries,” it is provided, “ that boats be kept on either side of the water, at Charlestown ferry, &c. the ferrymen on each side to have a separate interest; and that the ferry be not from henceforth leased out otherwise. And all the members of the general assembly shall be ferriage free at all ferries, in their passing to and from the assembly, and shall be transported without any unnecessary delay, on pain of forfeiting twenty shillings.”
By Prov. St. 8 Will. 3, c. 6, (Anc. Charters &c. 294,) it is provided, “ that when and so often as it shall happen, that the boats employed for the ferry betwixt Boston and Charles-town shall be on the same shore, upon the landing of the second boat, the first shall forthwith put off and pass over to the other side, passengers or no passengers," on penalty, &c.
The Prov. St. 9 Ann. c. 1, “ for the better regulating the ferry over Charles river, betwixt Boston and Charlestown,” after reciting that several petitions had been offered to the general court, signed by many of the inhabitants of Charles-town, Cambridge and other towns, complaining of neglect of due attendance of the ferry, “ and having thereupon been at *380 tended by the treasurer of the college (the profits and revenues of the said ferry being granted to Harvard College in Cambridge) and seen the lease by him made of the said ferry for several years yet to come, —for redress of the grievances complained of, and to the intent the said ferry may be accommo dated for the good and service of the province, and of her Majesty’s subjects within the same, much increased over what they were at the first settling of the ferry, now become a great passage for transportation; which, that it may be done with the more ease and speed, the said lease or leases notwithstanding : ” — enacts, that there shall be “ three sufficient suitable boats,” and prescribes the mode and time in which they shall continue plying and the rates of ferriage ; “the said three boats to be three several separate interests, not all of one town.”
The first book of the college records is said to have been destroyed when the library was burnt, in 1764. The first entry on the subsisting records relative to the ferry, is of a meeting of the corporation on August 4, 1701, when it was voted, “ that the ferry at Charlestown be let to John Russell,” &c.
At a meeting, April 7, 1713, after a recital that “ a motion has been made in the general court for the building a bridge over Charlestown ferry, and a committee appointed thereupon to receive proposals, &c. it is voted, — “ That the president, the treasurer, &c. be desired to represent and insist upon the right which the college hath in and to the profits of the said ferry, before the said committee, and as they shall find it needful and proper before the general assembly.”
At a meeting, October 27, 1713, it was voted, that whereas the general assembly have directed Dr. Clark and a committee of the house of representatives, upon a proposal to erect a bridge over the ferry, to confer with the college upon that affair, the president &c. be a committee to confer with Dr. Clark, &c.
At a meeting, February 10, 1725, the corporation vote that each of the boats be, for three years following the first of May next, leased to one person only, instead of two, as it then was.
*381 At a meeting, April 1, 1728, it is voted, that the treasurer oe desired to inquire what will be the expense of repairing with smooth stones the ferry way on the Boston side.
At meetings, on November 17, 1777, May 5, 1778, and November 28, 1779, votes were passed, directing the treasurer to settle the accounts for repairs on the ferry ways, and fixing the rent of the ferry and the rates of ferriage.
At a meeting, October 11, 1780, it was voted, “ that the treasurer be directed to order the necessary repairs for sheds on each side of the ferry, the cost to be hereafter laid before the general court for allowance.”
On the 16th of May, 1781, an act (St. 1780, c. 42,) was passed, u for the better government and regulation of the ferry between Boston and Charlestown, and for repealing the laws heretofore made for that purpose.” This statute requires, among other things, that there shall be four boats ; that each boat shall have a separate interest; that no person shall be appointed by the corporation of Harvard College a master ferryman, unless he shall be previously approved as a suitable person by the selectmen of Charlestown ; that upon notice from those selectmen of the misconduct of any of the ferrymen or owners of the boats, the corporation shall within sixty days discharge such ferryman or owner from any employment in the ferry, and in case of their neglect or refusal so to do, shall forfeit a sum equal to the rent of the ferry for the then current year ; that whenever the corporation shall make any alteration in the rates of ferriage, they shall publish the rates by them established, in one or more of the Boston newspapers ; and that there shall be made and kept in good repair, a convenient and comfortable shed, and suitable ways for passing to and from the ferry-boats, at the landing-place on each side of the river, at the charge of the corporation.
On February 17, 1786, upon an application of the ferrymen for an abatement of rent, the college voted, u that they be excused from paying any rent for the last three months preceding the opening of the bridge, provided they pay the rent now due, or that may be due to the aforesaid time, and conform themselves in all things agreeably to the rules and orders, settled by the corporation for the regulation of the ferry.”
*382 No vote was found, relating to the ferry, of a later date than the one last mentioned. The college records contain many other votes respecting the regulation of the ferry, the amount of fare, the leases and rents, similar in character to those above recited.
The secretary of the corporation testined, that in the records for one year before the 9th of March, 1785, and for the period since elapsed, there is no vote of the corporation conveying, or authorizing any person to convey, on behalf of the college, any ferry rights, or the ferry between Boston and Charlestown, to any person or corporation whatever.
It appears from entries in the books of account of the college, that the college received annually, for many years after 1639 and to the month of May, 1786, various sums of money as the profit or income of the ferry. In some years between 1639 and 1786, no account of the receipts of the ferry can be found. For several years after the grant of the ferry, the college managed it by their agents. For about one hundred years before 1786 they leased it at an annual rent payable quarterly The rents fluctuated very much during that period.
Extracts from the records of the colony of Massachusetts were exhibited, respecting other ferries. In 1638, “ Garret Spenser is granted the ferry at Lynn for two years, taking two pence,” &c. In 1639, “ the ferry between Mount Woolaston and Weymouth is ordered to be removed to the nearest and most convenient place,”.&c. In 1641, “it is ordered, that they that put the boats between Cape Ann and Anisquam, shall have liberty to take sufficient toll, as the court shall think meet, for one and twenty years.” In 1648, upon information given that there is no ferry kept over Neponset river, between Dorchester and Braintree, John Glover is empowered “ either to grant it to any person or persons, for the term of seven years, so it be not any way chargeable to the country, or else to take it himself and his heirs, as his own inheritance forever ; provided that it be kept in such a place and at such a price, as may be most convenient for the country, and pleasant to the general court.”
In 1670, “ for the encouragement either of the town of Cambridge or any particular persons that shall repair the bridge, *383 or erect a sufficient cart-bridge over the river at Cambridge, and maintain the same for the safety of passengers, they are hereby empowered to take toll at the rates following, &c. and this order to continue in force so long a time as the said bridge is maintained serviceable and safe for passage.”
On February 2, 1785, Thomas Russell and others offered a petition to the legislature, representing, “ that the only communication between Boston and the easterly and northerly part of this State, is by ferries, &c. and it has long been the wish of many to see a bridge erected across Charles river, in the place where the ferry between Boston and Charlestown is now kept;” that the “ petitioners, taking into consideration the great advantage that will arise, not only to the towns of Boston and Charles-town, but to all the country to the westward, northward and eastward, by the accomplishment of so desirable an object, have made some inquiries, &c. and have good reason to suppose that such a work (though at great expense) may be accomplished in such way and manner, as greatly to accommodate the public in general ;” that they “ are willing, provided suitable encouragement is given them, to undertake said work at their own cost and charge ;” and they pray to be incorporated “ for the purpose aforesaid, under such liberties and regulations, as will, make to them a suitable compensation for the great risk and charge that will be incurred in the prosecution of said business.”
On February 3, 1785, John Cabot and Andrew Cabot presented a petition to the legislature, representing that a bridge over Charles river, from Lechmere Point in Cambridge to Barton’s Point in Boston, would be essentially useful to the public ; that the petitioners are ready to build one at their own expense ; that they will be content to receive such reasonable ion as the legislature shall think fit to establish ; that so soon as the sum which may be expended in building the bridge, and the interest thereof, shall be paid to the petitioners by the reception of the toll, they will renounce all title to the bridge and the profits thereof, and the same shall be vested in the Commonwealth, and that so long as the petitioners shall be entitled to receive the toll, they will engage to pay 200Z. annually for the use of Plarvard College.
*384 On February 12, 1785, a petition was presented on behalf of the inhabitants of Charlestown, stating their sufferings during the war of the revolution, setting forth the advantages of having a bridge where the ferry is kept, and the inconveniences to the public and the injuries to themselves, which would attend a bridge erected from Lechmere Point to Barton’s Point, appealing to the compassion and justice of the legislature, and praying that the petition of Russell and others may be granted and that of the Cabots denied.
These three petitions were referred to a committee of both houses of the legislature, who reported that the petitioners for building a bridge at the ferry should have leave to bring in a bill for that purpose, upon certain principles ; one of which was, that there should be established, as a compensation for the expense of building and repairing the bridge, and as a revenue for the use of Harvard College, certain rates of toll, which were specified, for the term of-year's.
On March 9, 1785, an act was passed (St. 1784 c. 53,) “ for incorporating certain persons for tire purpose of building a bridge over Charles river, between Boston and Charlestown, and supporting the same during the term of forty years.” After reciting in the preamble, that “ the erecting of a bridge over Charles river, in the place where the ferry between Boston and Charlestown is now kept, will be of great public utility,” and that Thomas Russell and others have petitioned for an act of incorporation to empower them to build the bridge, the act provides (§1), that Russel] and others shall be a corporation un der the name of The Proprietors of Charles River Bridge : (§ 3), that “ for the purpose of reimbursing the said proprietors the money expended, or to be expended, in building and supporting the said bridge, a toll be and is hereby granted and established for the sole benefit of the said proprietors, according to the rates following, &c. and in all cases double toll shall be paid on the Lord’s day, &c. and the said toll shall commence at the day of the first opening of the said bridge for passengers, and shall continue for and during the term of forty years from the said day(§ 4), that the bridge shall be well built, at least forty feet wide, with a convenient draw ; shall be kept in good repair for the term aforesaid, and at the end of the term *385 shall be left in like repair ; shall be constantly kept accommodated with at least twenty good lamps on each side &c.; and the draw shall be lifted for all ships or vessels without toll or pay, except such as usually pass under Cambridge bridge, and those passing for pleasure : and (§5), “ that after the said toll shall commence, the said proprietors or corporation shall annually pay to Harvard College or University the sum of two hundí ed pounds, during the said term of forty years, and at the end of the said term, the said bridge shall revert to and be the property of the Commonwealth, saving to the said college or university a reasonable and annual compensation for the annual income of the ferry, which they might have received had not said bridge been erected.”
In 1792, the corporation of Charles River bridge remonstrated against the petition of Francis Dana and others, praying for license to erect a bridge over Charles river from West Boston to Cambridge. They allege, that in consequence of the charter granted to them in 1785, the proprietors of Charles River bridge immediately exerted themselves in its erection, at an expense which has amounted to upwards of 51,000 dollars, and have since added to that expense for its support, 18,800 dollars more ; that in 1649 [1640] this government (in the idea of this corporation) made an absolute exclusive grant of the ferry between Boston and Charlestown, to Harvard College, and upon this idea the corporation purchased this grant of the college at the price of 200Z. per annum ; that a full and valuable consideration was made for the grant aforesaid, by the corporation contracting with the legislature, that the bridge, at the expiration of forty years, should revert to the public in good repair ; that the profits have never amounted to eleven per cent upon the original cost, and that if a new bridge so near the present one should be erected, more than one half of the present profits must be lost: And they pray that the petitions may be dismissed, as militating in their principles with public faith, and operating to the very great injury of the remonstrants.
On Saturday, February 18, 1792, in the senate, it was oi dered, that the next Monday be assigned for hearing the proprietors of Charles River bridge, by their counsel, relative to the report of the committee of both houses, granting the peti *386 tion of Dana and others, and that those proprietors notify the petitioners, as soon as may be, of this assignment.
At the same session of the legislature, the college offered a memorial, stating u that m the year 1640 the legislature, in order to encourage learning, granted to the college the perpetual right of conveying passengers with their effects across Charles river, from and to Boston that when the British troops evacuated the town of Boston, the college, at a considerable expense, repaired and widened the ways and built sheds, &c. and that they received an annual income of 200Z., which income, as the country increased, would undoubtedly have increased in the same proportion; that a few years after, some persons made application to the legislature for liberty to build a bridge across the river, which was granted, on condition of their paying to the college the sum of 200Z. annually ; that to this the college, sensible of the advantage to the community in general from such an undertaking, made no objection, supposing that at the expiration of the term for which the bridge was given, it would become the property of the college ; that the corporation, hearing of an application for liberty to build another bridge over the same river, think it their duty to present this memorial, in full confidence that the legislature will take such measures as shall seem best, to compensate the college for the loss of the increasing income which would have arisen from the privilege granted them to the river.
A committee of both houses made a report, which was amended and accepted, that it would be expedient to grant to Dana and others leave to build a bridge over the waters of Charles river from West Boston to Cambridge on certain conditions. They further report, that they have considered the memorial of the college, and that they think it will be expedient to grant to that corporation the sum of 450Z. [as amended, 300Z.] annually, during the term of twenty [as amended, forty] years, and for such further time as the legislature may hereafter direct. They further report, “ that after attending tc the memorial of the proprietors of Charles River bridge, and hear ing them fully on the subject, they are of the opinion that there is no ground to maintain, that the act incorporating the proprietors for the purpose of building a bridge from Charlestown to *387 Boston, is an exclusive grant of the right to build over the waters of that river; but considering the erection of Charles River bridge was a work of magnitude and hazard, and that great benefits have arisen to the public from the success of that enterprise, and considering also that the erection of the proposed bridge may diminish the emoluments of the proprietors of Charles River bridge, which may operate as a discouragement to great and beneficial undertakings in future, the committee think it reasonable and proper that a further time of twelve [as amended, thirty] years be granted to said proprietors to receive and collect for their benefit the toll now established by law for passing said bridge.”
On March 9, 1792, an act was passed, (St. 1791, c. 62,) incorporating Dana and others, for the purpose of building a bridge from the westerly part of Boston to Cambridge. This act, for the purpose of reimbursing the corporation their ex penses in building and maintaining the bridge, and of indemnifying them for their risk, grants them a certain toll for the term of forty years. (§ 4). It provides (§ 5), that at the expiration of that term, the bridge shall be surrendered in good repair to the Commonwealth, and (§ 6), that after the toll shall commence, the corporation shall pay annually to Harvard College the sum of 300Z. during the term of forty years. In § 7, 8, it is said “And whereas the erection of Charles River bridge was a work of hazard and public utility, and another bridge in the place proposed for the West Boston bridge, may diminish the emoluments of Charles River bridge, therefore, for the encouragement of enterprise,” be it enacted, &c. that the proprietors of Charles River bridge shall continue to be a “corporation and body politic, for and during the term of seventy years, to be computed from the day that said Charles River bridge was completed and opened for passengers,” subject to the conditions and regulations prescribed in their act of incorporation, and during the aforesaid term of seventy years they “ may continue to collect and receive all the toll granted by the aforesaid act for their use and benefit; provided, however, they also continue to pay annually to said Harvard College the sum of 200Z. &c.; and at the expiration of said term of seventy years, said Charles River bridge shall revert to and be the property of *388 the Commonwealth, and shall be surrendered in good repair." In § 9, “ it is further enacted, that in consideration of the pnvileges in this act granted to the proprietors of Charles River bridge, the said proprietors shall relinquish the additional toll on the Lord’s day, from and after the passing of this act.”
In 1800, upon an application to the legislature by the } roprietors of West Boston bridge for an extension of their interest in the bridge, the college presented another memor al, in which they set forth the grant to them of the ferry between Boston and Charlestown, claiming it as a grant in perpetuity, and praying that the reasonable claims and just interests of the college may not be overlooked. It is stated in this memorial, that in 1712, when, upon the petition of John Clark, a bridge over Charles river was contemplated, it was done with “ an express reservation of the interest and revenue of the ferry to the college,” and that the general assembly, of their own mere motion and sense of justice, directed the petitioner and a committee of the house of representatives to confer with the president and fellows of the college on that affair.
In 1805 the proprietors of Charles River bridge chose a committee to defend the interest of the corporation against the attempts of all other persons to erect another bridge over Charles river to the town of Boston. This committee afterwards reported, “ that according to their observation and judgment, the public opinion in favor of another bridge from Charlestown has continually gathered strength, from the real or pretended want of a commodious avenue to the centre of Boston; and believing that unless a law, authorizing a new bridge, should pass in the course of one or two years, the zeal for such a project will abate ; and finally, being sensible that if a new bridge should ultimately be built, every year’s delay will be of important value, they have concluded that it would be highly prudent to assist and promote the establishment of a street over the mill-pond, from Charles River bridge to Middle Street; and accords gly have engaged, in behalf of the proprietors, to pay the sum of 12,000 dollars, to accelerate the making and finishing s&jd street,” &c. This report was accepted, and 10,500 dollars appropriated to fulfil the engagements of the committee.
In June, 1806, and January, 1807, the college chose com *389 mittees to present memorials to the legislature relative to a contemplated bridge or bridges over Charles river, and to take measures to secure the interests of the college.
At the session of the legislature in June, 1806, on the petition of Christopher Gore and others, praying leave to erect a bridge from Lechmere’s Point, in Cambridge, to Barton’s Point, in Boston, the petitioners were ordered to notify all parties, by publishing the petition, and the order, in certain newspapers printed in Boston, sixty days at least before the next session, to appear and show cause why the petition should not be granted.
In a report of a committee of both houses, in February, 1807, upon several petitions and remonstrances respecting the bridge from Lechmere’s Point, to Barton’s Point, the committee say, that “ after examination and due reflection on the various grants of bridges across Charles river, and the pretended conflicting rights, they can discern nothing in the said grants or the supposed rights of other corporations, or in the principles of justice and equity, that can be construed into an abridgment of the power of the legislature, to authorize the erection of any other bridge.”
On February 27, 1807, an act was passed, authorizing the building of the Canal bridge, from the northwestwardly end of Leverett street, in Boston, to the east end of Lechmere’s Point, in Cambridge. By this act the proprietors of Canal bridge are to pay to the proprietors of West Boston bridge 333 dollars and 33 cents, for every year that both corporations shall exist; and the proprietors of West Boston bridge are to continue to be a corporation for the term of seventy years from the time when Canal bridge shall be completed, and during that term are to receive toll and to pay 666 dollars 66 cents annually to the college. The act contains no provision in favor of the proprietors of Charles River bridge.
By an act of June 21, 1806, the “ Proprietors of Prison Point Dam Corporation ” were authorized to build a dam from Prison Point in Charlestown to Lechmere’s Point in Camnridge, and in 1815 and 1816 certain persons claiming to act under the right granted to that corporation, built a bridge from *390 Prison Point to the Canal bridge, the junction being within the town of Cambridge.
In January, 1828, John Skinner and others offered a petition to the legislature, alleging that the public convenience and necessity required another avenue between Charlestown and Boston, and praying to be empowered to build a bridge commencing on the southerly side of Charlestown square, and running to a point on the Mill-pond lands, near Mill creek, in Boston.
At the same session of the legislature, the proprietors of Charles River bridge offered a memorial, in which they state, among other things, that if the present bridge does not give every reasonable facility and accommodation to the public, they hold themselves ready to accomplish any thing, even to the extent of building another bridge, in any way pertaining to the convenience and accommodation of the public ; and that if the avenue to the bridge on the Charlestown side is thought to be inconvenient, they are willing to make it of any given width which the legislature may authorize. The memorial contained a vote, “ that the proprietors of Charles River bridge will, at any time hereafter, make all such additions, alterations and improvements in and upon said bridge and the avenues connected with it, as the legislature shall at any time authorize and direct.”
The committee of both houses of the legislature, to whom the last mentioned petition and memorial were committed, made a report stating the grounds relied on in support of the petition, and those taken on the other side. Of these last, one was, “ that the grant of another bridge, with or without tolls, in whole or in part, and without adequate indemnity to the proprietors of the existing bridge, would he an infringement of their just rights and a violation of the public faith.” The committee say, that “ they are of opinion, that public convenience and necessity require, and that public justice does not militate against the grant of a charter for another bridge from Charlestown to Boston, to be erected within the termini ana on the conditions prayed for by the petitioners.”
The statute of 1827, c. 127, (passed March 12, 1828,) to establish the Warren Bridge Corporation, authorizes the corporation to build a bridge across Charles river, from or near the *391 wharf in Charlestown, late the property of John Harris, deceased, to the newly made lands in Boston, near the Mill creek. By § 4, “ the corporation shall be holden to make compensation to any person, persons or corporation, whose real estate sha.11 be taken for the use of said bridge,” and if there should be a difference of opinion as to the value of the same, either party may apply to the Court of Common Pleas for a committee tr estimate the damage ; '•* provided, that in all cases either party may claim a trial by jury, as in similar cases where lands are taken for public uses.” In § 6, for the purpose of reimbursing the proprietors the expenses of building and supporting the bridge, the same toll is granted to them as was granted to the proprietors of Charles River bridge, and when they shall be reimbursed their expenses, with five per cent interest thereon, the bridge is to revert to and become the property of the Commonwealth; but the term for taking toll by the proprietors is not to exceed six years. By § 8, at the expiration of one year from the time of opening the bridge for passengers, and annually thereafter until the bridge shall revert to the Commonwealth, the proprietors “ shall pay out of the income accruing from tolls, one half the sum now required to be paid to Harvard College or University annually by the proprietors of Charles River bridge, and the said proprietors of Charles River bridge shall be exonerated from paying to said college or university, so much as is hereby required to be paid by the proprietors of the Warren bridge.”
There was a meeting of the proprietors of Charles River bridge, on April 1, 1785, at which meeting the corporation was organized. The bridge was finished and opened for passengers on June 17, 1786. The aggregate of tolls received from June, 1786, to January, 1827, was 824,798 dollars.
In the depositions of witnesses, it was stated, that for a long time prior to 1785 there had been a regular- ferry between Boston and Charlestown, which was reputed to belong to Harvard College ; and that there was no other ferry nor any other regular established means of communication between the two towns. The landing places were covered by the ends of Charles River bridge. When the bridge was built, it accommodated the same line of travel as the ferrry, so that im *392 mediately after the bridge was opened for travellers, the fen y boats ceased to be used. From that time there was no feriy or other regular means of communication across Charles river between Boston and Charlestown, except by this bridge, until the West Boston bridge was erected under the act of 1791.
The proprietors of Charles River bridge took double toll on the Lord’s day for several years ; but about the time of passing the act of 1791, or soon after the West Boston bridge was built (the witnesses could not specify the precise time), they ceased to demand the double toll, and it has never since been exacted. One witness recollected that he paid double toll once after the 22nd of May, 1792. The records of the proprietors did not contain any vote or directions to their agents to discontinue taking the double toll; and by the rules of the corporation, it is made the duty of the clerk to record the votes and transactions of the stockholders and of the directors. Persons have at all times since the bridge was built, both before and after 1792, crossed Charles river in boats, on Sundays and other days, and there was no evidence that they were ever prohibited from crossing in any direction : neither was there evidence that the owners of the boats had ever demanded toll.
The distance between the northerly ends of Charles River bridge and Warren bridge, on the Charlestown shore, is 260 feet. The avenues from them lead to Charlestown square, converging from the bridges to the square, where the distance between them is 26 feet 3 inches. . The distance from the northerly end of Charles River bridge to the square is 426 feet; and the distance from the northerly end of Warren bridge to the square, is 390 feet. Charlestown square is the principal place of business in that town, and through which much the greatest part of the travel between Boston and Charlestown usually passes. The distance between the southerly ends of the bridges, on the Boston shore, is 915 feet in a direct line across the water. Charles River bridge communicates with Charlestown street and other streets, leading into the city of Boston. Warren bridge communicates with Haverhill and Causeway streets leading into the city. Charles-town and Haverill streets are the principal avenues leading respectively from the two bridges into the central part of Bos *393 ton and the part at which the mercantile business is chiefly transacted. These two streets converge from the bridges and intersect each other at a point on the mill-pond, so called. The distance from the southerly end of Warren bridge to the point of intersection is about 1463 feet, and from the southerly end of Charles River bridge to the same point is about 1385 feet. Warren bridge is 1390 feet long, and Charles River bridge is 1323 feet. So that the whole distance from Charles-town square to the intersection of Charlestown and Haverhill streets, is 3134 feet by the way of Charles River bridge, and 3243 feet by the way of Warren bridge.” (/See plan on next page.)
Warren bridge would accommodate the whole of the travel which now passes over Charles River bridge, and the whole travel which will pass over Warren bridge, would, if that bridge had not been erected, pass’over Charles River bridge. Persons going from Charlestown square to the westerly part of Boston, would probably go over Warren bridge, the distance being less than over Charles River bridge ; to other parts of the city the distance is not less by the way of Warren bridge.
In Charlestown, at the distance of 1300 feet from Charles-town square, is a street, called Austin Street, leading from Main Street to Prison Point. Austin Street, Prison Point bridge and Canal bridge, afford a convenient avenue from the upper part of Charlestown to the westerly part of Boston, and many persons pass that way ; but in comparison with those who pass over Charles River bridge, their number is small.
The end of Warren bridge on the Boston shore is on what constituted, in 1786, the old Mill Pond, and at that time the land to a considerable distance east and west was covered with water. The southerly end of Charles River bridge was placed on the most westerly part of Boston at which a bridge could then be conveniently placed on solid ground, leading from Charlestown square to the central part of Boston. The westerly part of Boston, in 1786, contained scarcely any inhabitants. The population and business of that part of Boston which lies west and south of a continuation of the line of Charles River bridge, has increased since 1785 much more than the population and business of the part which lies east and *394 north of the same line. Much the greater part of the inhab itants of Boston reside to the west and south of a line forme» *395 by a continuation of Haverhill Street. The number of inbabHants in Boston in 1785 was conjectured to be about 18,000 ; m 1825 it amounted to 58,281. The inhabitants of Charles- • i . town m 1785) were supposed not to exceed 1000 ; in 1820 the number amounted to 6,591. The population of the neighbouring towns has likewise increased very much since 1785.
The act of 1784, incorporating the proprietors of Charles River bridge, was- at an early period recorded in their book of records, but no vote accepting that act, previous to one passed in 1826, is found on their records. At a meeting of the proprietors July 13, 1802, it was voted, that the clerk be directed to record the parts of the act of 1791 which relate to the Charles River bridge. At a meeting February 15, 1826, the proprietors recite, that an act was passed on the 9th of March,
1792, for incorporating the proprietors of West Boston bridge ; that they had remonstrated against the erection of that bridge s an infringement of their rights, and had claimed an indemnity, and the provision in that act extending their interest in their bridge for the term of seventy years &c. was taken, deemed and accepted by them as an indemnity for the loss and diminution of emoluments which they would sustain by reason of the erection of the new bridge; that the act provided that they should relinquish the additional toll on the Lord’s day, and that they did, from and after" the passing of the act, relinquish it; and that by such. relinquishment, by ordering such clauses in the act as related to them to be recorded among their records, and by divers other proceedings, they manifested their acceptance of the act, but that no express vote appears on their records accepting the same ; they then say, “ Now therefore, as well for the purpose of ratifying and confirming all the acts, doings and proceedings of this ^corporation. its officers and agents, manifesting an acceptance of the provisions of said act, as for placing on their records an express vote to that effect, voted, that an act passed on the 9th day of March, 1792, entitled, &c. with all the terms, conditions and limitations therein contained, so far as the same in any manner apply to this corporation, be and the same are hereby accepted.”
After West Boston bridge was built, a great proportion of the travel to Boston which passed through Cambridge, and *396 which before that time passed over Charles River bridge, was diverted and passed over West Boston bridge. When Canal bridge was erected, which was in 1816, it diverted travel from both of the other bridges.
The proprietors of Warren bridge were organized April 14, Í828, under their act of incorporation. A by-law was passed on that day, authorizing the directors to build the bridge. On • December 25, 1828, the bridge, being completed, was opened for passengers.
The tolls received at Charles River bridge from tire 5th to the 20th of January, 1829, being sixteen days, amounted to 466 dollars. The amount of tolls received in the same period at Warren bridge was 707 dollars. From January 5, 1829 to April 2, the amount of tolls at Charles River bridge was 2423 dollars, and at Warren bridge, 3755 dollars. The amount received at Charles River bridge from December 25, 1828, to June 30, 1829, was 6525 dollars ; the amounts received during the corresponding periods of 1825 and 1826, of 1826 and 1827, and of 1827 and 1828, were respectively, 15,631 dollars, 15,356 dollars, and 14,911 dollars.
At a meeting of the directors of Charles River bridge corporation, September 22, 1786, it was voted, “ that the treasurer have an order to pay the corporation of Harvard College.” On October 20, 1786, they voted that the treasurer pay the college “ to the first of October instant, and after that to pay them quarterly.” There is no vote on the records of the proprietors of Charles River bridge by which they agree to be bound to pay the college. The foregoing votes are the only ones found relating to the subject. The annuity of 200Z. reserved to the college by the act of 1785, has been received by their treasurer from the treasurer of the bridge, in quarterly payments, ever since October 1, 1786. The payment made on that day was 56Z. 13s. 4tZ. and was m full to that date.
On July 7, 1829, the treasurer of the college received'of the treasurer of Warren bridge 166 dollars 67 cents, for six months’ annuity, from December 25, 1828, to June 25, 1829 ; the payment being made in pursuance of the provision in the act incorporating the proprietors of that bridge.
Formerly there was a ferry, called Penny ferry, over Mvs *397 tick uver, leading from Charlestown and Malden. About the year 1787, certain persons incorporated for the purpose, built Malden bridge at the same place, whereby the ferry was destroyed. There was no evidence that any compensation was made to the owner of the ferry.
Oct 8th.
About the year 1803, Chelsea bridge was built over Mys-tick river between Chelsea and Charlestown. This bridge is about a mile and a quarter from Malden bridge, and the end on the Chelsea shore is not more than fifty rods from the ferry-ways on the same shore, of Winnesimmet ferry. This ferry between "Chelsea and Boston is about a mile and three quarters in length, across an arm of the sea. Chelsea bridge diverted a great deal of travel from Malden bridge, but in the act of March 6, 1802, authorizing the erecting of it, there is a recital, that it is agreed that the Malden bridge corporation shall have the property of half of the Chelsea bridge and pay half of the expenses of the same bridge. The Winnesimmet ferry was much injured, first by the erection of Charles river and Malden bridges, and afterwards by the erection of Chelsea bridge ; but the owner of the ferry never received any compensation for these injuries, though he presented to the legislature a,remonstrance against the erection of Chelsea bridge.
The free bridge from Boston to South Boston diverted much travel from the old bridge between these two places ; and the mill-dam between Boston and Roxbury caused a diversion of travel from West Boston bridge ; but in neither case did the legislature provide for an indemnity to the suffering party.
It did not appear that in either of the cases before mentioned, the party sustaining damage had resorted to any legal process to obtain redress.
Shaw, for the plaintiffs. The facts stated in the bill are in general admitted by the defendants. Of the allegations denied in the answer, one is that there was an ancient ferry from Boston to Charlestown and no other convenient mode of transpor tation between the two towns. The proof of this allegation rests in legislative acts, tradition, history and ancient records. The evidence establishes the fact, that the ferry had its commencement as early as the year 1631.
*398 The defendants deny that the proprietors of Charles River bridge ever accepted the act of 1734. It appears, that they organized themselves as a corporation immediately after the act was passed, and built the bridge. These facts are sufficient proof of an acceptance.
It is further denied, that the ferry was granted to Harvard College. We rely on the act of the general court of 1640, which declared, that u the ferry between Boston and Charles-town is granted to the college,” and the subsequent acts which are in the case, recognising and confirming the grant; and on the proceedings of the college in relation to the ferry. Even before the year 1640 the profits were received by the college, and they were the reputed owners from that period until the year 1786.
If the college owned the ferry, the defendants deny that the legislature could grant it to the plaintiffs. But the college acquiesced in the transfer, upon receiving an annuity in recompense. The defendants say that the college did not assent to the grant of the plaintiffs’ charter, and had no knowledge of it; but the receipt of the annuity implies assent, as well to the extension of the charter as to the original grant ; and in the memorial of the college in 1792, their assent to the charter is ex pressly recognised.
The defendants deny that the act of 1791 was accepted by the plaintiffs. Their proceeding in conformity to its provisions was an acceptance ; and further, that act being in their favor, an acceptance is to be presumed. But, ex majori cautelé, before the expiration of the first grant they passed a vote expressly accepting the extension of their charter.
It is denied that there was any vote to relinquish the double toll on Sunday. Such a vote was not necessary. Simply omitting to take the double toll was sufficient; and it appears that the plaintiffs have never exacted it since 1792.
The defendants deny that the plaintiffs have paid to the college the annuity provided for in the acts. The proof of the payment is complete.
They deny that they had an intent to divert the toll from our bridge. Our allegation was made without much consideration, but it is sustained by the evidence. For in the defendants’ pe- *399 . tion to the legislature, they set forth the necessity of relief from the burden of heavy tolls, which the public now pay at Charles River bridge, (though it is difficult to perceive how another bridge with the same tolls wil' relieve the public,) and that the proprietors of Charles River bridge have already received a much greater compensation than was contemplated by the legislature
They deny the allegation, that the corporation defendant have no real or personal estate to respond damages which the plaintiffs may recover for any injury they may sustain. Whether they have such property or not, depends on the question, whether they have a right to take toll.
They deny that all the travel referred to in the bill has always heretofore, and must, as the highways now are, pass over Charles River bridge, if the Warren bridge should not be constructed. Our allegation is to be taken in connexion with the rest of the bill. It means that the direct travel between Boston and Charlestown would pass over our bridge ; and this is proved by the evidence in the case. It is true there is a way over Canal bridge and Prison Point Dam bridge, but that is through Cambridge. We do not allege that there is no circuitous travel between Boston and Charlestown.
They deny that the college discontinued the ferry. In a technical sense it may be true : but in a popular sense it is otherwise, for it is clearly proved that the boats ceased to ply, after the bridge was finished.
They allege that our bridge is a monopoly. A monopoly gives an advantage without a consideration. But here there was a consideration. They say that a grant of exclusive privileges, except for services already rendered, is contrary to the bill of rights. Can any good reason be assigned why such a grant should not be made in consideration of future services ? Patents under the laws of the United States are always granted with a view to subsequent benefit to the public. It is said that the erecting and maintaining of our bridge were not contemplated by the legislature as highly important and beneficial services to be rendered to the public ; in answer, we would only refer to our act of incorporation.
The defendants do not distinctly deny that the Warren *400 bridge will accommodate the same line of travel as our bridge , and it appears in fact, that of the tolls taken at both bridges, about two thirds are received at the Warren bridge.
The great question in the case is, whether the plaintiffs have an exclusive right to maintain a bridge and collect the tolls ; exclusive to the extent set forth in their bill, so that the erection of the Warren bridge is, in respect to the plaintiffs, a nuisance.
By the operation of their act of incorporation, by their acceptance of it, and by the assent of the college, they became the successors and assignees of the college in regard to this ancient ferry. The word assignment is to be taken in relation to the subject-matter. Here three parties must concur. The government must yield the franchise of building a bridge over navigable waters, in lieu of the ferry ; the college must give up the ferry ; and the plaintiffs must accept both. The plaintiffs are assignees in equity of the ferry right. The owner of a ferry cannot let it go down and build a bridge in its stead, without a grant. It would be a usurpation. Pain v. Patrick, 3 Mod. 294. The college would have been indictable, had they not been excused by the legislature, for letting the ferry go down, for a ferry is publici juris, and all the subjects have an interest in it. Pain v. Patrick, ubi sup. What is the nature of a ferry ? It is a franchise ; a right and duty to keep boats for the transportation of passengers. It is an incorporeal hereditament. In a ferry are embraced several rights : — 1. A right to use the land on each side of the water as a landing-place. Ipswich v. Browne, Sav. 11, 14 ; Rex v. Nicholson, 12 East, 330 ; Peter v. Kendal, 6 Barn. & Cressw. 703. 2. The right of franchise ; which may be in the government, a subject or a corporation. 3. The jus publicum, or the right of all the subjects to use the ferry. 4. The jus regium, or the right of the government to make salutary regulations concerning the ferry. 5. The eminent domain or the right of appropriating the property or franchise to the public use, when necessary to the public welfare. 2 Dane, 683, tit. Ferry, cites most of the authorities.
The evidence that it was intended that the proprietors of Charles River bridge should be the owners of the ferry, is their act of incorporation. The compensation given by them for the *401 ferry shows that the bridge was to be a substitute. It was a matter of purchase. The right is saved to the college, of having, at the expiration of forty years, afterward extended to seventy, the same revenue which it would then have had from the ferry in case the bridge had not been built The bridge too is built at the place of the old ferry-ways
The plaintiffs having then become the owners of the ferry, it is to be considered how far the franchise was exclusive. We say that the government were precluded from establishing another ferry between the two peninsulas of Boston and Charlestown ; and though it is sufficient for us to show that there was no right to set up another ferry within a few feet of the old landing places, yet the evidence is conclusive of our right to the extent just stated. All the other bridges over Charles river connected with Boston are between Boston and some other town than Charlestown.
Without defining precisely what are the limits to which the exclusive right of a ferry extends, it is clear that it must have a reasonable extent, and at all events, a new ferry must not accommodate the same line of travel. “ If a ferry is erected on a river, so near another ancient ferry as to draw away its custom, it is a nuisance to the owner of the old one.” 3 Bl. Com. 219 ; Tripp v. Frank, 4 T. R. 666 ; Ogden v. Gibbons, 4 Johns. Ch. R. 159, 160. If the new one is erected very near to the old one, it is by intendment of law a nuisance ; if at a considerable distance, the question of nuisance is to be tried by a jury. The Warren bridge is between the same termini as the ferry, and is incontestably so near as to draw away the custom. Yard, v. Ford, 2 Saund. 172.
Nor will the king’s grant prevent the new ferry from being a nuisance to' the old one, though an ad quod damnum may have been executed. An ad quod damnum is issued ex majori cautela. But the grant of a new ferry, fair or market, is always made on condition that it do not affect any existing ferry, fair or market. But even if this clause were omitted, the law would imply it and give a remedy in an action on the case for a nuisance. Yard v. Ford, 2 Saund. 172 ; 2 Inst. 406 ; Rex v. Sir Oliver Butler, 3 Lev. 222.
The right of the ferry then in the college being exclusive at *402 least so far as to embrace the place where the defendants have built their bridge, the plaintiffs, having for a valuable consideration succeeded to the owners of the ferry, must be deemed to have the same exclusive right. After the passing of the act of 1784 and the acceptance of the annuity, the college would have been liable to our action for a disturbance, if they had continued to keep up a ferry, or to a quo warranto at the suit of the Commonwealth.
But the plaintiffs are entitled to the right which they claim, by their act of incorporation and the additional act of 1791. These acts passed by the legislature, and accepted, acted upon and complied with by the plaintiffs, constitute a contract, by which the plaintiffs acquired an incorporeal hereditament; being a valuable property, consisting in the franchise of being a corporation and taking the tolls mentioned in the acts, for the term of seventy years. By the constitution of the United States, the legislature had no right, directly or indirectly, to impair this contract in the slightest degree. Fletcher v. Peck, 6 Cranch, 87 : New Jersey v. Wilson, 7 Cranch, 164 ; Terrett v. Taylor, 9 Cranch, 49 ; Dartmouth College v. Wood ward, 4 Wheat. 516; Green v. Biddle, 8 Wheat. 84 ; Wyman v. Southard, ibid. 50.
What then is the true construction of this contract, and the extent of the grant ?
It was intended to be a beneficial grant. The bridge is recited to be a work of public utility and of great hazard. The proprietors are to erect and maintain it at their own charge, and to pay an annuity to the college, and at the termination of their charter, are to surrender the bridge to the government in good repair. The toll is granted for their “sole benefit” for the purpose of reimbursing them their expenses.
But in order to be beneficial, the grant must be exclusive. The contemplated reimbursement depended upon receiving the tolls at the rates specified, upon all the carriages, &c. therein mentioned, including the whole line of travel between the termini. The rates of toll being fixed, if another bridge is placed so as to take a portion of the carriages, &c. in the same line of travel, at the same or a reduced rate of toll or without toll, the toll established for the plaintiffs’ sole benefit is in part taken *403 away The income thus reduced may not be sufficient to keep the bridge in repair, but the plaintiffs are notwithstanding obliged to keep it in repair and to pay the college annuity.
A grant is always to be so construed as to effect the intent of the parties, and a necessary implication will have the same force as express terms. Although not expressed, the grantee is to have all that is essential to the taking and enjoying of the thing granted. Co. Lit. 56 a; Finch’s Law, 100 ; Plowd. 317 ; Darcy v. Askwith, Hob. 234 ; Liford’s Case, 11 Co. 52; Perk. § 111, 116 ; Bro. Abr. Incidents, pi. 8, and Nusans, pl. 14, cites 9 E. 4, 35 ; Saunders’s Case, 5 Co. 12 ; 1 Wms’s Saund. 323, note 6 ; Mien’s Case, Owen, 113 ; Gayetty v. Bethune, 14 Mass. R. 56. What was the substance of this grant ? Not the strip of land forty feet wide occupied by our bridge ; not a right of way ; not a mere license to build a bridge over navigable waters ; — the substance of the grant was, the right to take certain tolls for certain carriages &c. on a given line of travel. In order to be beneficial it must be exclusive.
If we attempt to ascertain the intent of the parties from the nature and subject-matter of the grant itself, we come to the same result. The construction uniformly put upon similar grants, whether for ferries, turnpike roads, bridges, or the like, is, that the grant of the tolls upon passage necessarily excludes such competition as would materially diminish the tolls. Newburgh Turnp. Co. v. Miller, 5 Johns. Ch. R. 112 ; Ogden v. Gibbons, 4 Johns. Ch. R. 161 ; Livingston v. Van Ingen, 9 Johns. R. 568, 573.
The intent of the parties wall be rendered still more clear, if the charter is considered in reference to the local circumstances of the bridge and its termini, and the object had in view at the time of the grant. The object expressed in the title of the act, was to build a bridge between Boston and Charlestown. At that time the two peninsulas approached each other in a manner very different from what they do at this day, and the streets on both sides led towards the termini of the bridge. All the travel between Charlestown square and Boston must have been contemplated in the act.
One mode of determining whether the plaintiffs have any exclusive right to the franchise of taking toll is, by inquiring *404 whether they could have maintained any action for injurious competition. Toil bridges are rare in England, and therefore the authorities relate more frequently to ferries. A ferry is a franchise derived from the king’s prerogative, which cannot be set up without the king’s license. When so erected, a person cannot erect another to the nuisance of it. Churchman v. Tunstal, Hardr. 163. If he does, an action on the case lies, 3 Bl. Com. 318 et seq. And such action lies, notwithstanding the second ferry may have been set up under the king’s license and after an ad quod damnum executed. Hale T)e Port. Mar. (Hargr. Tr.) 59 ; Rex v. Sir Oliver Butler, 3 Lev. 221 ; S. C. 2 Ventr. 344. A scire facias for repealing a patent may be sued by a person prejudiced thereby, as well as by the king. Brewster v. Weld, 6 Mod. 229 ; Com. Dig. Patent, F, 4, 5, 6, 7 ; 2 Wms’s. Saund. 72, note 4 ; 4 Inst. 88. It is clear then, that an action will lie for a disturbance in fact of a ferry ; and this proves that a right of ferry is an exclusive franchise.
In this respect a bridge is like a ferry. It cannot be set up without the king’s license. Either is a part of a highway. In erecting a bridge there is a greater outlay of money, on the sole chance of being reimbursed by the tolls ; so that the case is stronger than that of a ferry.
Without reference to the act incorporating the proprietors oí the Warren bridge, the plaintiffs have made out, prima facie, a case of property. The defendants deny the exclusive right which we claim, and they set up their own right under their act of incorporation.
The defendants say we have only a license to erect a bridge ; a license to use a strip forty feet wide, of flats and river, and to get all the tolls we can of persons going over the bridge. A license is merely for the private convenience of the grantee, as to build a wharf or dam for private use ; a bridge ex vi termini implies public use. The proprietors of a bridge would be in dictable for suffering it to be out of repair.
The defendants justify and claim a right to erect and maintain their bridge, without compensation to the plaintiffs for the loss they may sustain, by force of the act of the legislature.
We say this act does not purport to divest, restrain or limit *405 the rights of Charles River bridge. It is in its terms simply a grant. It is therefore to be construed as an act granting such rights as the legislature had a right to grant, and no more. As against the public, it gives the grantees a right to obstruct navigable waters and to take toll; but it does not purport to authorze an invasion of private rights. And if it did in the most express terms, it would be merely void and inoperative. It follows, that if the Warren bridge is an encroachment upon the rights of the plaintiffs, the defendants are amenable to them in the same manner and to the same extent as if there had been no legislative act. Jackson v. Catlin, 2 Johns. R. 248 ; Catlin v. Jackson, 8 Johns. R. 406.
The case then is brought to this question, whether, if no legislative act had been passed, the plaintiffs could maintain an action against the defendants. The grant to the plaintiffs was, to some extent, exclusive, or it was simply a license to use a strip of land and water forty feet wide and take toll of such persons as should pass over it. If it was in any degree exclusive, either by express terms or by necessary implication, the legislature are in that degree restrained from making any other grant. If the plaintiffs had only a license, as above mentioned, then the defendants, without any act of the legislature, might have erected another bridge by the side of Charles River bridge immediately after this bridge was built and before the plaintiffs had leceived any benefit from it, and yet would have been liable to no action by the plaintiffs ; and it is no answer to say they would have been liable to an indictment for a public nuisance.
The only way of avoiding the alternative above stated, is to maintain, that the grant to the plaintiffs was to a certain extent exclusive, but that such exclusive grant was subject to the implied condition, that whenever the public exigency should require another bridge within the limits of such exclusive grant, the government reserved to itself the right, without compensa tion or indemnity, to erect such other bridge, and that of this exigency any future general court were to be the sole and exclusive judges. It is only necessary to state this proposition to show its inconsistency with all sound and just notions of pri vate right. In a matter of contract t-etween the governmen *406 and its subjects, in relation to property, the grant of a particular revenue or toll, exactly specified, for a definite term, without any apparent reserve or condition, there is a tacit reservation on the part of the government of a right to resume, within the term, the whole substance of the grant or to convey it to others ! A doctrine so dangerous derives no sanction from the common law. In England, a second grant, if it impairs a preceding one, let the public exigency be what it may, is deemed void, not only as against the first grantee, but as against the crown, it being considered as improvidently made. How does this case of a franchise differ from that of land, which is derived from government ? Land is subject to be resumed for roads, &c. but it is upon granting an adequate compensation. The substance of our grant is a right to take tolls. This is the only beneficial part of it; all the rest is burdensome. If the government have tacitly reserved such a right as above described, they may determine how it shall be exercised, and the) may appoint a man to take the tolls for their own use. And it is manifest from the Warren bridge act, that the government are taking away the tolls for their owm benefit; for in six years or sooner, that bridge is to revert to the Commonwealth. There will then remain twenty years before the charter of Charles River bridge will expire, during which the government will be receiving the revenue of the Warren bridge ; nor must they omit to receive it, for then that bridge will be a greater nuisance to us than it is at present. Can the legislature thus draw into its treasury the tolls before granted to us ?
The authority relied on by the defendants to erect their bridge, is inoperative and void, in so far as it impairs the rights of tlie plaintiffs ; being repugnant to the constitution of the United States, by impairing the obligation of contracts ; and repugnant to the same constitution and to the constitution of Massachusetts, by appropriating the private property of the plaintiffs to the public use, without providing any compensation.
It has already been shown, that the acts of 1784 and 179., granting and extending the plaintiffs’ charter, constitute a contract, and which is exclusive to a certain extent; that the Warren bridge is erected within that extent; and that it dimin *407 ishes in a great degree the amount of the plaintiffs’ tolls, and in the same degree diminishes the value of their franchise. It has been determined, that the clause in the constitution of the United States applies as well to executed as to executory contracts ; to grants as well as to covenants and other contracts. Fletcher v. Peck, 6 Cranch, 87. And any legislative act which impairs the title or diminishes the value of the right, properly or interest created or vested by a grant, does impair the obligation of a contract, and is thus far, and for this cause, null and void.
Has the Warren bridge act provided any compensation to the plaintiffs, agreeably to the constitutions of this State and of the United States ?
In the 10th article of our bill of rights, it is declared, that ££ whenever the public exigencies require, that property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor.” The provision in the constitution of the United States is, cc nor shall private property be taken for public use, without just compensation.” These provisions, made for the security and protection of the subject, are to have a benign and liberal construction. All kinds of property are to be protected ; and “ taking ” or £C appropriating ” necessarily includes all means by which the title or beneficial interest in such property may be divested or diminished. The construction uniformly put upon these clauses, and which is necessary in order to render them effectual as security, has been, that the provision for compensation must be made simultaneously with the act giving the authority to take the property, and unless this is done, the authority is void. Gardner v. Newburgh, 2 Johns. Ch. R. 168 ; Perry v. Wilson, 7 Mass. R. 395 ; Stevens v. Middlesex Canal, 12 Mass. R. 468 ; Callender v. Marsh, 1 Pick. 430 ; Vanhorne's Lessee v. Dorrance, 2 Dallas, 304.
In this case provision is not made for compensation. In the 8th section of the act of 1827 it is provided, that until the Warren bridge shall revert to the Commonwealth, the proprietors shall pay out of the income accruing from tolls, one half the annuity required to be paid to the college by the proprietors of Charles River bridge, and these proprietors are to *408 be exonerated from paying such half. Our consent to this arrangement is not asked, and the payment by the Warren bridge is to. be made out of tolls to which we have a right The 4th section provides for an indemnity only where real estate shall be taken. The legislature have no right to determine the nature of the compensation, the amount of it, nor the mode in which it shall be ascertained. The damages are to be determined only by agreement or by a trial by jury. Vanhorne’s Lessee v. Dorrance, 2 Dallas, 304.
In Day v. Savage, Hob. 87, an act of parliament, made against natural equity, is said to be void. Perhaps the expression may be too strong, as courts in England are subordinate to parliament; but here the Supreme Court is a co-ordinate branch of the government, and any legislative act must be declared void, so far as it conflicts with the constitution. Marbury v. Madison, 1 Cranch 137 ; 1 Kent’s Com. 425 ; Wilkinson v. Leland, 2 Peters’s Sup. Ct. R. 627.
The defendants allege that the legislature have always had the control of navigable waters and of public highways, ferries and bridges, and have been accustomed to proceed as they have done in this instance, without making compensation. We deny that there has been any such usage. But if there was before the constitution, it was repealed by the constitution ; and if such a usage has grown up since, it is repugnant to the constitution and has no more validity than a law would have.
It is said too, that the increase of population required another bridge. If that were true, it would not impair the plaintiffs’ rights. Mosley v. Walker, 7 Barn. & Cressw. 40 ; Mosley v. Chadwick, ibid. 47, note. They offered to furnish such further accommodation for the public as the legislature should direct. At any rate, the public exigency did not require that their franchise should be taken away without compensation.
Several documents have been introduced, to show that the government have the right of regulating ferries. But such a right is not inconsistent with an exclusive property in the owner of the ferry. The government have never claimed the right of taking away tolls which they have granted.
Webster, on .the same side, cited, to show that where there is an existing franchise, no part of it can be regranted unless *409 there has been a forfeiture, Rex v. Passmore, 3 T. R. 199 ; Rex v. Amery, 3 T. R. 565 ; Wales v. Stetson, 2 Mass. R. 143 ; Rex v. Vice Chancellor &c. of Cambridge, 3 Burr. 1656,2 Bl. Com. 37 : — As to the nature of a ferry, Termes de la Ley, voc. Ferry; Com. Big. Piscary, B ; and how fa1* it is a monopoly, 17 Yin. 88, Prerogative fyc., M. b ; 13 Yin 208, Ferry: — As to the rule for construing the king’s grant, and as to the effect of subsequent usage in the construction of a grant, 17 Yin. 152, Prerogative c/c., O. c ; Blankley v. Winstanley, 3 T. R. 286, 288, 291, note:—And to the point, that where a franchise, which existed in the hands of a subject with certain rights, revests in the king and is regranted, it passes with the same rights, Palm. 78.
Aylwin, for the defendants. By the civil and common law, all navigable waters, inlets and arms of the sea, are recognised as public property ; and roads, ferries, and bridges are treated as matters to be regulated by the sovereign authority. Inst. lib. 2, tit. 1, § 2, 3, 4 ; Dig. lib. 39, tit. 2, l. 24 ; lib. 43, tit. 12, l. 4 ; Grot. lib. 2, c. 3, § 9; 2 Domat, Public Law, bk. 1, tit. 8, § 1, no. 7 ; Vattel, bk. 1, § 100,244,245 ; Case of the Isle of Ely, 10 Co. 141 ; Com. Big. Chimin, S. 1; Piale, Be jure Maris, part. 1, c. 1 ; ibid. c. 3 ; 2 Inst. 38 ; 1 Hawk. P. C. c. 76, § 1 ; Finch’s Law, 164, c. 14; Hooker v. Cummings, 20 Johns. R. 100. So by the Feudal law. 1 Bl. Com. 264. That they belong to the public domain and are subject to the control of the State, the decisions of this Court abundantly testify. Commonwealth v. Coombs, 2 Mass. R. 493 ; Hood v. Dighton Bridge, 3 Mass. R. 267 ; Arundell v. M'Culloch, 10 Mass. R. 70 ; Commonwealth v. Charlestown, 1 Pick. 165. fn Commonwealth v. Breed, 4 Pick. 404, the Court say, tc The legislature has power to regulate and control all public highways and the navigable waters within the limits of the State. This power has been exercised from the commencement of our government.” In the exhibits and in our statute books will be found ample evidence in support of this declaration. Anc. Charters, &c. 110, 280, 448, 623 ; St. 1796, c. 42.
Upon general principles therefore, and according to the earliest usage, the general court had the power to pass the act under which the defendants claim to erect their bridge, unless *410 there existed some particular restraint taking the case out ol the operation of their general jurisdiction. The burden rests on the plaintiffs to make out such restraint.
Before proceeding further, it may be well to examine whether the standing of the plaintiffs in court is made out by the consistency of the proof with their allegations.
It is alleged in the bill, that the act of 1791 was duly accepted and that the conditions on which it was to take effect were complied with. This the defendants deny. The doings relied on for proof of acceptance are the immediate entry on their records, of the portions of the act relating to their corporation ; the discontinuance of the double toll; and a formal vote of acceptance passed before the expiration of their charter. The evidence proves that the entry referred to was not made till the 13th of July, 1802, being ten years, instead of immediately after 1792. This entry, being an act in itself equivocal, was not sufficient to show an acceptance, and it was not made in due season. The vote of February 15, 1826, four months only before the expiration of the forty years, was clearly too late. The corporation had waited till the last moment, to ascertain what might be the possible disadvantages of an acceptance, and finding no burden, but on the contrary, immense benefits to flow from it, they passed the formal vote now relied on.
In the amended bill the plaintiffs deny that they ever solicit • ed the acceptance of the report of the joint committee of the general court extending to them for twelve years the term of taking toll, or the enlargement of it by the legislature to thirty years. This then rebuts the presumption of an acceptance of the additional act, earlier than in 1826, from its being for their benefit. They assert that no application on their part was made for the new grant.
The extension might have been to their detriment, as they were required to relinquish the additional toll on Sundays ; and the burden of maintaining the bridge during the enlarged period, in case of casualties which they affected to dread, might have more than counterbalanced the benefit. The stockholders might have paused on this question. For this reason then *411 their assent is not to be presumed. Union Locks and Canals v. Towne, 1 New Hampsh. R. 44.
The proof does not show an immediate relinquish^ u of double toll. The testimony of the witnesses on the part of the plaintiffs is merely of a negative character ; while one witness on the part of the defendants testifies positively to the payment of it.on the first Sunday after the 22nd of May, 1792. To fulfil the intent of the legislature, there should have been an express relinquishment by a vote ; otherwise there would be nothing to bind the corporation. Ellis v. Marshall, 2 Mass. R. 269.
Where an act is to be. done, and no time is prescribed in which it is to be performed, it must be done within a reasonable time. Co. Lit. 208. That ten years after March 9, 1792, was not a reasonable time for the acceptance, can hardly admit of a doubt. Hayden v. Stoughton, 5 Pick. 528.
The act incorporating the proprietors of Warren bridge, is' alleged by the plaintiffs to be invalid, because in effect it authorized the taking of private property for the public use, within the meaning of the constitution of the United States, and was an appropriation of it for the like object, within the true intent of the constitution of this Commonwealth, which could not be done without at the same time providing a reasonable compensation.
The foundation on which this objection rests is controverted by the defendants. If any property has been taken, it is real property, and by the 4th section a provision for indemnity is made.
What is the nature of the property alleged to have been taken ? Is it real or personal ? A ferry is an incorporeel hereditament; Co. Lit. 6a; and as considered by the plaintiffs themselves, a franchise having locality. It falls within the definition of the civil law, of immovable property, and of the common law, of real property. By the common law it might have been demanded in a prcecipe quod reddat; and by force of St. Westm. 2, c. 25, an assise of novel disseisin was given for it. 2 Inst. 409 ; Humphreys on Real Prop. 8.
But the defendants deny that any property of the plaintiffs has been taken or appropriated by the act in question. The *412 claim of the plaintiffs is, in reality, to a mere naked right; to the exclusion of the public from the use of the navigable waters of the Commonwealth for the purpose of transportation. Such a right cannot be property, within any known or practical meaning of the term, nor, if infringed, is there a taking or appropriating of property within the intent of either constitution. The community, in their sovereign capacity, being the owners of these navigable waters, possess the right of using them at their pleasure, unless they have imposed some legitimate restraint on themselves by compact. If they have not so restrained themselves, and they actually made such use of them as to affect the interests of the plaintiffs, it is damnum absque injuria, and falls clearly within the principle touching public rights, recognised in the case of Callender v. Marsh, 1 Pick. 418. See also Thurston v. Hancock, 12 Mass. R. 220.
Have the legislature so restrained themselves that they could not make the grant to the defendants, without the violation of a prior contract ?
In opposition to the plaintiff’s claim to an exclusive right, we malee several objections.
1. The ferry was not an ancient or prescriptive ferry, in the legal import of those terms, as would seem to be implied from the statement in the bill, but originated in a grant known and shown to the Court.
This is clearly proved by the orders of the colonial govern ■ ment and other evidence in the case. In Hull v. Horner, Cowp. 108, Lord Mansjield says, “ Any written evidence showing that there was a time when the prescription did not exist, is an answer to a claim founded on prescription.” Co. Lit. 115 a.
2. The grant did not pass a franchise of a ferry, but merely the liberty of receiving the profits ; and that only during the pleasure of the government.
In construing the order of 1640, by which “ the ferry be tween Boston and Charlestown is granted to the college,” the general course of legislation on the subject of this and other ferries may be well taken into view. In the preamble to a revised statute dated 1636, 1640, 1642, it is recited, that the government had given the revenue of the ferry for the en *413 couragement of the college. Anc. Charters &c. 78. In 1659 the general court order, that “ besides the profit of the ferry formerly granted to the college, which shall be continued,” 100Z. shall be paid yearly to the college, and this to continue during the pleasure of the country. Anc. Charters &c. 80. By a provincial act of 1695 it is provided, that boats shall be constantly kept on either side of the water at Charlestown ferry, the ferrymen on each side to have a separate interest, and that the ferry shall not be leased out otherwise ; and that all the members of the general assembly shall be ferriage-free, at all ferries, in their passing to and from the assembly. Anc. Chart. &c. 281. The St. 9 An. c. 1, recites that the treas urer of the college had attended with the lease of the ferry, which had several years to run, and enacts that notwithstanding the lease, there shall be three sufficient suitable boats, and that they shall be three several separate interests, not all of one town. It appears from the college records, that in 1780 the treasurer was directed to order the necessary repairs of the sheds on each side of the ferry, and to lay the cost’before the general court for allowance. And further, the statute of May 16, 1781, (St. 1780, c. 42,) passed after the formation of the State constitution, manifests a continual control over this public right. That act prohibited the ferrymen from making a commoss stock of their interest, under a penalty ; required that no master ferryman should be appointed by the college without the annual approbation of the selectmen of Charlestown ; and declared that the appointment by the college, of ferrymen, should not be for a longer term than one year. And last of all, the act of 1784 incorporating the proprietors of Charles River bridge, was made without asking the consent of the college and without their interfering in its enactment. It appears then that none of the essential attributes of property belonged to or were exercised by the college, except receiving the revenue. The legislature constantly exercise the dominion which belongs to ownership ; and although they do not withdraw the income, still they exempt from ferriage whom they see fit, and prescribe the manner in which the ferry shall be leased or managed ; and at last, they deprive the college of *414 the future increase of the income of the ferry, and fix its rate at 200Z. for forty years to come.
Further, the college could not have taken any thing under the order of 1640, in the nature of an estate, for they were then a voluntary association. They could not be grantees. They were not incorporated until 1650 ; which is a strong circumstance to show that the grant was during the pleasure oí the general court. 2 H. 7. 13. pi. 16.
3. If however the franchise of a ferry was granted, it was in no sense exclusive of the right to grant other ferries or bridges, but confined solely to the landing places.
The plaintiffs assert that the ferry had certain termini, namely, the lower or southerly part of Charlestown and the northerly part of Boston, and within these limits they allege it to have been exclusive. In terms the grant contained nothing exclusive, nor did it subject the college to any duty or obligation whatever for the support of the ferry.
No judicial construction of an original grant of a ferry is to be found in the English books. The cases relate solely to prescriptive ferries ; and although the foundation of these is presumed to he laid in grant, and in practice they have received a most liberal extension, yet such a franchise excludes those only who interfere without right or authority. Churchman v. Tunstal, Hardr. 162 ; Blissett v. Hart, Willes, 508 ; Anonymous, 1 Ves. sen. 476 ; Tripp v. Frank, 4 T. R. 668 ; Cruise’s Dig. tit. 34, § S.
By the law of England, a ferry, although sui generis, is not inconsistent with the general principles of that law regarding highways. A public privilege and a private right unite to form a ferry ; the public privilege of passing across the water, and the private right of carrying passengers and receiving the toll.
A prescription cannot be maintained against the public without the existence of some equivalent. In general, it cannot be claimed in a highway. In 22 Ass. pi. 58, it is said the complaint was that the toll was outrageous, and it was claimed as toll-thorough. Thorpe there said, that toll-thorough was an oppression of the people, and that it was against common right. Toll-traverse may be by prescription or grant; but toll-thorough cannot be by either grant or prescription. Fitz. N. B. (9th *415 ed.) 227, note c. ; 2 Roll. Abr. 522, Toll. The inheritance of every man in the king’s highway is prior to all prescription. Smith v. Shephard, Moor, 574 ; Truman v. Walgham, 2 Wils. 296 ; Keilw. 148, pl. 29. The king cannot grant toil to be taken in the highway, which is free; but pontage and murage may be granted, because there is quid pro quo ; and no longer than the bridge is maintained for the use of the subjects, or the wall shall continue for the defence of the subjects, shall the toll be demanded. Darcy v. Allin, Noy, 176. At least the prescription must show an obligation to repair and maintain the way, to entitle the party to his claim of toll; and must reach back ás far as the reign of Richard I. 2 Bl. Com. 29 ; 2 Inst. 238 ; Co. Lit. 113 6 ; Gravesend Case, 2 Brownl. & Gould. 181 ; Nottingham v. Lambert, Willes, 111. The English courts have been anxious to narrow tírese exclusive claims. Wilkes v. Kirby, 2 Lutw. 1519. So in this State. Arundel v. M'Culloch, 10 Mass. R. 70.
In the case at bar we contend, that there is neither a prescription nor a grant of a franchise. The ferry could not have been prescriptive, for there was no corresponding obligation imposed on the college to maintain it. But suppose there was an absolute grant in 1640, we say it was confined to the respective landing places of the ferry as they then existed. Webb’s Case, 8 Co. 92. In Ipswich v. Browne, Savil. 11, 14, it was held, that a ferry is in respect of the landing place, and not in respect of the water. 13 Vin. 208, Ferry ; Com. Dig. Piscary, B. And in each ferry the land on both sides ought to belong to the owner of the ferry. Ibid.
The plaintiffs must contend, that a grant of a license by the legislature, coupled with an interest in its execution, not merely passes the license itself, but prohibits succeeding legislatures from giving any other license of a like kind. The common law, it is apprehended, affords no countenance to such doctrine. The common law enables the owner of a franchise tc prohibit any one without license or authority, from exercising a similar right to his prejudice. The text in the different abridgments is general. It is said, “ If I have a ferry by prescription or an ancient ferry, and another erects a ferry near the ancient one, case lies.” 2 Roll. Abr. 140, pl. 4. Rolle cites *416 22 H- 6. 14 b, as the authority for holding it to be a nuisance. Comyns, in his Digest, tit. Action upon the Case for a Nuisance, A, quotes Rolle, and adds no other authority except Churchman v. Tunstal, Hardr. 162, which disproves the position. Hale (in Fitzh. N. B. 184, note a,) cites the same Year Book, 22 H. 6. 14, and Blackstone (3 Com. 219) cites Hale.
The judicial colloquy recorded in the Year Book is shortly this. On a question whether an action would lie for establishing a second mill in the same town where there was already one, of ancient continuance, it was resolved in the negative. Paston puts this case. “ If I have a market on Saturday, and another levies a market or a fair on the same day in a vill which is near to my market, so that my market or fair is impaired, I shall have against him an assise of nuisance or action on my case. And the same law is, if T have of ancient time a ferry in one vill and another levies another ferry near to my ferry, so that the profit of my ferry is impaired by it, I shall have against him an action on my case.” Newton replies, “ Your case oí a ferry differs from the case at bar, for in your case you are holden to sustain the ferry and to serve it and repair it for the ease of the common people, and may be grievously amerced ; and this is inquirable before the sheriff’s tourn, and also before the justices in eyre.” Here the discussion was on a prescriptive ferry. That the doctrine is true of a wrongdoer’s interfering with an ancient ferry, we need no authority from the Year Book to prove. But when it is pressed against one claiming to act under a license from the government, the rule is carried to an unwarrantable extent. Some express decision should be required.
In Blissett v. Hart, Willes, 512, note a, it was held, that a ferry is publici juris; that it is a franchise; that no person can erect one without a license from the crown, and when one is erected, another cannot be erected without an ad quod damnum. If a second is erected without license, the crown has a remedy by a quo warranto, and the prior grantee has a remedy by action.
The expression that a second ferry may not be erected without license, implies that with license it may be erected.
In 1 Hayw. N. Car. Rep. 459, on an appeal from an ordei *417 ol the county court authorizing a ferry to be kept at or near the place of one previously established, the Superior Court were divided. Stone J. says, “ The county court are empowered to establish ferries. They are the proper judges where it is fit to establish them. There are two femes established at the same place in several parts of this State. This proves the power of the county court to establish them.” See also Long v. Beard, 3 Murph. N. Car. Rep. 57 ; Stark v. M‘Gowen, 1 Nott & M‘Cord, 395.
It does not appear that an authority for setting up a ferry was always considered indispensable by the English courts. The great question in Churchman v. Tunstal was, whether the owner of land on each side of the river, who set up a ferry, was not in effect authorized to do so by his ownership, without any license. An injunction was applied for to restrain the defendant, who had set up a ferry within three quarters of a mile of an ancient ferry. The court (of Exchequer) refused the injunction, because the privilege claimed came too near a monopoly and restrained trade, and no precedent shown. The reporter adds a “ query, for contrary to 22 H. 6, and to precedents m like cases in this court.” It is said in 2 Anstruther, 608, that on a new bill in 1660 before Hale B. the new ferry was suppressed. It is somewhat strange, if this authority had been overruled, Hardres should not have known of it, when the supposed reversal took place only a year after the decision, and that Hale should not have mentioned it, in his note to Fitzherbert. It is observable however, that the case is distinct in principle from the rule we are now considering, as the defendant did not claim under a license, but under a common law right.
In the case of the lessees of the dean and chapter of Durham, 1 Ves. sen. 476, who applied for an injunction to restrain certa n watermen from using ferry-boats on the Tyne, Lord Hardwicke did not appear to be willing to admit the exclusive claim, nor did he advert to the necessity of an ad quod damnum to justify the defendants. He denied the application, upon the insufficiency of the affidavits to prove that boats enough were kept to answer the wants of the population of Newcastle_ and he observed, “ this is like a ferry on the Thames and pas *418 sage boats to Gravesend, which have a sole right of carrying, yet other wherries do carry every day, and it is not held an "nfringement of that^right.”
The decisions in regard to fairs and markets, affirm the principle, that with a license a second ferry may be set up. Unless the new market is set up within seven miles of the old one, it is not a nuisance ; and this without any ad quod damnum. Bract. 238 ; Fitzh. N. B. 184, note a. In Yard v. Ford, 2 Saund. 175, which was an action on the case for setting up a market without any lawful warrant or authority, to the nuisance of an ancient market, Tioysden J. said that the plaintiff was entitled to judgment, as the defendant was an apparent wrongdoer, but “ that if the defendant had a patent to levy his market, perhaps it might he more doubtful.”
It is not denied that the identical franchise cannot be bestowed by the crown on a second grantee ; but that a grant of a similar franchise or thing may be made upon an ad quod damnum, duly returned, is very clear. In Rex v. Sir Oliver Butler, 3 Lev. 220, a grant had been made upon a writ of ad quod damnum to Butler, to have a market at Chatham ; and on a sci.fac. to repeal this grant, it was alleged that the city of Rochester had a prior grant of a market within a mile and a half of Chatham, and that the ad quod damnum had been executed surreptitiously. The second patent was held void, but Levinz adds, that “ the defendant sued another writ of ad quod damnum and took a new patent, which was granted because a market at Chatham was very convenient, if not (absolutely) necessary in respect of navigation, and the shipping and stores, and the laborers about the shipping there.”
Thus it appears, that the question whether the privilege claimed is or is not a direct interference with an elder one, is left to the traverse on the ad quod damnum. And no doubt it is practically decided by public convenience, as an inquiry of this bind necessarily must be. If the public convenience counterbalances the remote or consequential loss to the individual, then the return would unquestionably be in favor of a new grant or license. Hale Be Portibus Maris, (Hargr. Tr.) 59, 60.
There is an analogy between the exercise or control of *419 these public rights, and the discontinuance of ways, and of passages in navigable waters, which is another branch of prerogative power intrusted to the executive authority for the public good. These rights, as they affect the public, may not only be changed by act of parliament, but by writ of ad quod damnum, and, perhaps, by commissioners of sewers, if they found it would be for the advantage of the whole land. Rex v. Montague, 4 Barn. & Cressw. 603 ; Fitzh. N. B. 226.
Further, if the owner of a market does not provide sufficient accommodation for the public, he cannot maintain any action for an interference with his right, against those who undertake to supply his deficiency. Prince v. Lewis, 5 Barn. & Cressw. 363.
Now in the amended bill the plaintiffs admit, for the purposes of this hearing, that public necessity or convenience did require another bridge. If they had an exclusive right, they ought to have supplied the want. Not having done so, the egislature might authorize any one to perform this public duty. In Mosley v. Walker, 7 Barn. & Cressw. 52, cited on the other side, Lord Tenterden says, “We are not called upon, on the present occasion, to lay down as a general rule and principle of law, that the grant of a market for the sale of certain things necessarily carries with it an exclusion of the right of sale of similar commodities in a private house, whether the market is convenient or not.” The consideration failing on which the grant was made, that is, the public convenience, no previous inquiry in order to put an end to it seems to be necessary. When the deficiency is proved, it is a sufficient answer to the claim.
From the authorities now examined it may be deduced as the law of England ; — 1. That a ferry is an incorporeal hereditament and a local franchise, having respect only to the landing places: — 2. That a person without a license, interfering with an ancient ferry, is considered a wrongdoer, and liable in a suit for damages : — 3. That upon an ad quod damnum a new ferry may be licensed. Beyond this, that law is silent.
In this Commonwealth no provision has ever been made for ssuing a writ of ad quod damnum. The power of establishing, altering and discontinuing roads and ferries, has been from *420 time to time delegated to subordinate tribunals. The subject appears to have been intrusted to their discretion. In no instance has a license granted by them been deemed exclusive.
When navigable waters were to be permanently obstructed, resort has been had to the supreme power of the State, the legislature The control of this portion of the eminent domain was reserved by the legislature ; and the history of our legisla tive proceedings may be appealed to with safety for the support of this position. The petition to the legislature stating the public wants, is followed by an order of notice ; sometimes a viewing committee is appointed ; then a committee of both houses to give the parties a hearing ; which terminates in a report as the basis for the conduct of the legislature. The proceedings from time to time in relation to the bridge of the plaintiffs, and the subsequent ones connected with Boston, are according to the course pursued both before and since the revolution.
From the adoption of the State constitution in 1780 to 1811, among the various statutes passed authorizing bridges to be built over navigable waters, there are but four instances in which the subject of compensation is brought into notice ; viz. Essex bridge in 1787, Essex Merrimack bridge in 1792, Haverhill bridge in 1793, and Andover bridge in 1794. During this period there were fourteen instances where bridges were authorized to he built at or near ferries, as mentioned in the acts, and no compensation was provided ; besides a multitude of cases where probably ferries were in use, the existence of which is not noticed.
That a grant of a ferry does not ex vi termini import any ca elusive right, except at the particular landing places, is not only shown by the uniform course of legislation upon this subject, and in relation to this particular ferry itself, but it follows from the nature of our country and the circumstances under which it was settled. If the doctrine contended for by the plaintiffs had been adopted, the first grant of a ferry on the Merrimack at Newbury, or on the Connecticut at Springfield, would have carried the right to the river in its whole extent ; for no other ferry, at that early period, could have been set up, which would not have drawn away the custom from the one already established. This doctrine of exclusive privilege was not then *421 entertained. It has since been engrafted by cupidity upon possession. The first settlers came with a fixed hostility to exclusive privileges of all kinds, and as early as 1641 they de0 v * dared, that “ there shall be no monopolies granted or allowed amongst us, but of such new inventions that are profitable to the country, and that for a short time.” Anc. Charters, &c. 170.
4. Whatever may have been the rights of the college in the fern-, the college did not grant or convey the same to the plaintiffs for the term of forty years, mentioned in the act of 1784.
No grant is produced and no lost grant is supposed. There is no chasm in the college records. No vote is exhibited authorizing the transfer or showing that any one had been made The proceedings of the legislature furnish no evidence that such grant was made, or that the rights of the college were surrendered by the college, and then granted by the government to the plaintiffs. If the franchise was surrendered, it was extinguished ; and if it exists, it must have been re-created by express enactment. Finch’s Law, 164, c. 14. There is no room to presume a grant from the college; the operative instrument of transfer must be the act of incorporation. The plaintiffs allege that the payment and receipt of the annuity, and ceasing to keep the ferry, furnish ground for presuming, not a grant, but the agreement of the college to the act of the legislature. Their silence or acquiescence proves nothing. If A suffers B to convey his property to C without making known his title, it amounts at most only to an estoppel. But here C knew of A’s title. Certainly no grant of A’s rights is to be inferred in such a case. Besides, no consideration is given to the college for the supposed grant. They were already in the receipt of the 200Z. a year. The conclusion to be drawn from the acquiescence of the college, and from the omission of the petitioners for the bridge to treat with them for their supposed rights, is, that neither party believed any such rights to exist. The right to dispose of and manage these navigable waters was considered to be in the Commonwealth alone, and hence, instead of providing in the act of 1784, that the college, at the end of forty years, should be put in possession of the bridge *422 which is stated to he a substitute for the ferry, it is to revert to the Commonwealth.
The ferry was an hereditament, and lay in grant, and not in livery ; and by our St. 1783, c. 37, § 4, could pass only by deed duly acknowledged and recorded.
5. But if the plaintiffs had the right of the college for forty years j they ceased to have it on the termination of that period.
The college received no consideration for the extension of the term. The annuity was not increased, notwithstanding the increase of population and travel. The assent of the college was not asked nor given.
6. Whatever right the college might have to a ferry, the) could convey no right to the plaintiffs as a corporation to builo a bridge. Payne v. Partridge, 1 Show. 243, 257 ; S. C. 1 Salk. 12 ; S. C. 3 Mod. 293.
7. No such exclusive right as is claimed by the plaintiffs was conveyed by the legislature, by the act of incorporation for the term of forty years.
That the act of incorporation is a contract, we do not deny; and if the recent act violates that contract, and so is repugnant to the constitution of the United States, we concede that it is in the power of tire Court to declare the recent act to be void. But so much respect is due to any legislative act solemnly passed, that the Court, will presume it to be constitutional, until the contrary clearly appears. Hilton v. United States, 3 Dallas, 175 ; Colder v. Bull, ibid. 395, 399 ; Cooper v. Telfair, 4 Dallas, 18 ; Fletcher v. Peck, 6 Cranch, 128 ; Adams v. Howe, 14 Mass. R. 345.
We contend that the contract entered into in 1785, was, that the proprietors of the bridge should be a corporation for the term of forty years, and that they should have authority to take toll, for their sole benefit, of all persons who should pass over the bridge during that period. This is the whole of the exclusive right.
An exclusive grant to the extent claimed, would have been a violation of the constitution of the Commonwealth. Exclusive privileges can be granted only for “ the consideration of services rendered to the public.” Bill of rights, art. 6. In *423 the choice of modes to prevent any abuse of the power of rewarding such services, the only safe and practicable one which occurred to the makers of the constitution, was, to require that the services should be rendered before they should be rewarded ; in which case the nature and value of them could be ascertained.
A grant made by the public is not to be extended by implication. A grant made by the king at the suit of the grantee, shall be taken most beneficially for the king and against the party. •It shall not enure to any other intent than that which is precisely expressed. 2 Bl. Com. 347 ; Royal Fishery of the Banne, Davies, 157 ; Finch’s Law, 100 ; Legates Case, 10 Co., 112; The Elsebe, 5 Rob. A dm. R. 162 ; The King v. Capper, 5 Price, 217 ; Portland Bank v. Apthorp, 12 Mass. R. 252.
8. Still more strongly, if possible, is all idea of such an exclusive right negatived by the language of the extension of the charter in 1792. The plaintiffs at that time set up a claim to this exclusive right by purchase from the college. The committee of the legislature, in their report on the plaintiffs’ remonstrance, deny the existence of the exclusive right claimed to build over the waters of Charles river, and the act itself of 1791, is silent as to any such right.
Fletcher, on the same side. This case, however important it may be in a pecuniary point of view, to the parties themselves, is of much greater importance in reference to a free course of legislation. The general welfare is closely connected with it. The present age is remarkable for the progress of improvements ; which is the natural result of a liberal competition.
The plaintiffs seek to annul a law opening another avenue to the large and increasing metropolis of Massachusetts. This law was not enacted through inadvertence. The object of it had been several years under the consideration of the legislature, and the plaintiffs had again and again urged their objections ; which were deemed invalid.
The defendants have been charged with a disposition to invade private property. They maintain as strongly as any one, that property is to be protected, and that contracts should be ¿Id inviolable. They have no greater interest in the present *424 case than the rest of the community. Nor have they acted without a due regard to the rights of the plaintiffs. It is not to be concealed, that this claim on the part of the plaintiffs is not new. In the cases of the West Boston bridge and the Canal bridge, this same question of exclusive right under the college and under the plaintiffs’ charter, was presented to the consideration of the legislature, and was disallowed. Some of the most distinguished lawyers in the Commonwealth were active in obtaining the grants for those bridges, and tire plaintiffs have acquiesced for more than thirty years in the supposed violation of their rights.
The claim now made will not bear examination. It cannot be stated, in any form, so as not to be bad on a demurrer at common law.
The plaintiffs allege that they were authorized to build a bridge at or near the place where an ancient ferry was kept; but the expression in their charter is in the place. They allege that their bridge was designed to accommodate a certain line of travel leading to and from the southerly part of Charlestown and the northerly pari of Boston. If this means any thing, it means a line of travel from Charlestown square to the north end of Boston ; and with that the defendants do not interfere. But in truth, Charles River bridge was intended to accommodate the whole country. Travel came from the east, north and west, from other States as well as from different parts of our own ; and the idea of a line of travel taking in all this is preposterous. West Boston bridge was upon this line of travel, if it can be so called, as much as Warren bridge.
They do not allege that by their act of incorporation they had an exclusive right over these waters. But they set out that there was an ancient ferry owned by the college, and that when their act was passed, the college consented to accept of them 200Z. per annum, in satisfaction and as a compensation for the exclusive right to the whole ferry, and thus they became successors and assignees of the college for forty years, and sc were entitled to erect a bridge : a palpable non sequiiur.
The original charter to the proprietors of Charles Rivei bridge has expired, and if the act of 1791 has not beer, *425 accepted and the conditions been performed by them, they have no longer any right.
We allege that they had an agency in procuring the extension of their charter; but this they deny. It is certain they did not apply for a charter to the proprietors of West Boston bridge, but remonstrated, and represented that the profits received had not amounted to eleven per cent upon the original cost. If their bridge was so unpromising and they did not interfere in the extending of their charter, there can be no presumption of their accepting the extension. As it was a grant imposing liabilities and increasing burdens, there ought to be proof of an express acceptance. They produce no vote to that effect of an earlier date than 1802. They kept a bridge indeed, but it was by virtue of the original charter ; and nothing was done by them by which they would be bound, previous to 1802. A vote of acceptance in that year would have been too late, but they produce no such vote. Merely entering the act on their records neither implies acceptance nor non-acceptance. It would not have estopped them from denying any acceptance ; and so they understood it, since in 1826 they passed a vote expressly accepting the extension. This was too late. The legislature ought to have been informed of the acceptance, as it might affect their proceedings in respect to other bridges. We had applied for a new bridge in 1823. [Parker C. J. Is it not an answer to this, that in the act incorporating the proprietors of the Warren bridge (§ 8) the legislature recognise the charter of the plaintiffs as being in force ?] The question of acceptance was not before the legislature, and we think that that recognition is not an estoppel.
The relinquishment of the double toll was a condition, a compliance with which was indispensable to the extension of the plaintiffs’ charter. The proof is, that they did not give it up immediately after the passage of the act of 1791. The relinquishment ought to be by some express corporate act; not merely by ceasing to take the toll. For suppose that West Boston bridge had not been built within the three years allowed ; the complainants would then have resumed taking the double toll, and they could not have been prevented. And *426 most of the witnesses say that the ceasing to take the double toll was after the West Boston bridge was built.
The plaintiffs allege that the recent act is contrary to the constitution of this State, because it takes away their property without providing for compensation. We admit that the legislature cannot take private property for the use of the public, without making compensation. Neither do we deny that a. ferry right is property. We contend, however, that it is real property. It is a local franchise ; of which the owner may be disseised. And for the recovery of it, he might have an assise of novel disseisin, (St. Westm. 2, c. 25,) a prmcipe quod reddat, and an habere facias. These remedies are applicable only to real property. And if we have taken their real estate, they have a remedy given expressly in our act of incorporation. We have no authority to take personal property, and if we have done so, we are liable to an action.
We contend that we have not taken any real property belonging to the plaintiffs. The nature of their estate is appar ent. They have their bridge. Higher up the river the public have the right. The.complaint is founded on the circumstance, that the public have used their property above the bridge, whereby the plaintiffs have sustained damage. If the public have restrained themselves from so using their own property, doubtless we have no right to maintain our bridge ; but still we say that we have taken no property from the plaintiffs. The case is precisely like that of Callender v. Marsh, 1 Pick. 418. Though the plaintiffs may suffer, the loss is occasioned by a legitimate exercise of the power of the public over their own property, and is damnum absque injuria. It is a collision of interest, not of right; and the interest of the few must yield to that of the many. The proprietors of Charles River bridge ought to be the last persons to complain of hardship. They say they built their bridge for the public benefit, and all they asked was to be reimbursed. Their charter gave them a toll for that purpose, and. their receipts have been equal to many times the amount of their disbursements.
The next question is, whether the act of 1827 is in violation of the constitution of the United States, as being an act im pairing the obligation of a contract.
*427 The act is within the general scope of legislative authority, the object of it being to make a highway over an arm of the sea. It is not a wanton exercise of power, but was intended to meet the demands of the public. The question of convenience and necessity is to be determined by the legislature, and is not to be rejudged elsewhere. The act itself need not purport to be founded on public convenience and necessity ; that is implied in the mere enactment.
But the plaintiffs say, that although public convenience and necessity might require another bridge, still our act was not required ; that they offered to make another bridge, or to sell their franchise, or to reduce their tolls. If they could under their charter build another bridge, or make a spur-bridge, why did they not do so ? Their conduct shows that they had little faith in the ground they assume, of a right to the whole of the river between Boston and Charlestown. They claim now, that no rival bridge shall be erected between Boston and Charlestown. Formerly they claimed a right over the waters as high up as West Boston bridge. If they go upon principle, they must exclude all injurious competition, and they were right in opposing the construction of that bridge. But they say, that whether a competition shall be lawful or not, depends on the degree. There can be no degree in principle. They must either say that the legislature can authorize no competition at all, or that they may allow as much competition as they please. A very large amount of toll was drawn off by West Boston bridge and Canal bridge, in which the plaintiffs acquiesced ; and it is absurd to say that the amount makes any difference. The question is entirely within the discretion of the legislature.
The legislature are only bound not to re-assert any right which they have before granted ; and the question is, whether the same right has been granted to Warren bridge that had been previously granted to Charles River bridge. The plaintiffs say that the whole right of transportation between Boston and Charlestown had been granted to the college, and so the grant of a part of it to the Warren bridge is an infringement on the first grant.
It is necessary then to consider what was the right as be *428 tween the government and the college. This is matter o) record ; all prescriptive right is excluded. Until the year 1650 the college had not interfered in the management of the ferry, but had only received the income. It was then provided by the government, that when the lease should expire, the col lege might dispose of the ferry by lease or otherwise, but on condition that it should be under the regulation and control of the government. In 1654 there was a grant of 100Z. and, as we. say, of the revenue of the ferry, to continue during the pleasure of the country. In 1655 the government lent the president of the college for his personal expenses, the sum of 30Z., to be repaid out of the income of the ferry. In 1694 and 1710, acts were passed, regulating the ferry. In 1780 the college made repairs on certain sheds connected with the ferry, and directed the expenses to be laid before the legislature. And lastly, in 1781, the entire control of the ferry was taken into the hands of government. Our construction of these and the other proceedings relating to the ferry is, that no grant of the ferry itself was made to the college, but that they were permitted to receive the income, as a gratuity. It was suggested that there was no distinction between a grant of the income and of the thing itself ; but it may be said as well, that the grant of the annuity makes the college the owner or a part owner of the bridge The words of the grant of 1640 might carry the ferry, but the acts of the government and of the college, before and after the grant, give to it a different construction. The college was not then a corporation; and no burden was imposed on them of managing and looking after the ferry ; but to let them receive the income, was consistent with the intention of the govern ment and the situation of the college. The only object was, to give the college some revenue. The government was die pa iron ; they were the beneficiaries. On the application of the college stating that they could manage the ferry to more advantage tiian the government, they were in 1650 allowed to dispose of it on certain conditions. The college could not have been indicted for not keeping boats and maintaining the ferry. They might have declined doing so when they pleased, and the government might have resumed the ferry at pleasure. The course-of interference on the part of the gov *429 eminent rebuts the idea of a grant; and the interference was commensurate with the public exigencies, until the moment when the ferry was superseded by the bridge. It is idle to talk of the consent of the college to the act of 1784, which takes away the whole franchise. It is a mere fiction. They were not a party to the act, and had no voice in the matter. A provision is indeed made for their benefit, but they made no application for it. In 1800, it is true, they recite their consent, but it was with a view of gaining something. Whatever they had received, had been bestowed as a bounty.
Whenever the ferry was spoken of, it was understood as perfectly defined ; it was from one landing-place to the other. In Saville, it is said, the ferry is in respect of the landing-places. The plaintiffs contend, that the exclusive right of transportation between Boston and Charlestown, to the end of time, and without any reference to increase of population, was given to the college. Such a position is not creditable to the intelligence of our ancestors. They came to this country with a hatred of monopolies, and they ordered, not that no monopoly should be granted, but that none should be allowed. They foresaw the augmentation of population and the increasing wants of the country. There were several ferries already from Boston, and if in this case they threw away public rights in the manner supposed, it is a solitary instance. They knew thé difference between an indefeasible grant and one revocable .at pleasure, and between a grant which was exclusive and one which was otherwise. (See the order in 1648 respecting the Neponset ferry.)
And this exclusive, interminable right of the college, is sold for an annuity of only 200L per annum! The plaintiffs set out that they are the assignees of the college, and owners of this exclusive right. One would naturally expect to see some parchments and formality in a negotiation of such magnitude ; but the whole turns out to be a fiction. No deed or vote of the college is pretended ; there has been no loss of any instrument ; but still the plaintiffs say they are grantees, because the college ceased to keep up the ferry and received the annuity. If the college did own this ferry exclusively and absolutely, the destruction of it was a high-handed interference on the part *430 of the government. But it is said a compensation was made. A sum fixed by the legislature was given, but that was not a constitutional compensation. Vanhorne v. Dorrance, 2 Dallas, 315. The college had a right to a trial by jury. Their acquiescence does not change the nature of the act. The plaintiffs say, that by reason of the payment of the annuity, they became purchasers of the ferry, whether the college consented or not, and so they were equitable assignees. [ Webster. We say the evidence shows a consent.] The college ceased to keep up a ferry and received the annuity, but these acts do not show that the college were a party to the act of 1784. The proceedings of the legislature were on the ground, that the college had no control of the ferry. The college would not wish to quarrel with the government which had been their benefactor, but it is extraordinary that they should have been willing to yield all their rights to the plaintiffs. The plaintiffs did not pay the annuity; it came out of the public, out of the tolls. The government did not intend that the annuity should be considered as a compensation to the college, and according to the authorities on the other side, it could not be so ; it was a gratuity from the government. There was no increase of the amount which the college had been accustomed to receive, and yet the bridge, at the end of forty years, was to revert, not to the college, but to the government, saving to the college'a reasonable compensation for the income of the ferry. This repels any title in the college, independent of the pleasure of the government.
The plaintiffs say that the bridge is a substitute for the ferry ; that they are the successors and grantees of the college, and that they stand in the same situation as owners of the ferry. If so, they are subject to the same regulations ; which they will hardlv admit. But they say the legislature are restricted by ttieir grant. If so, then the grant of the ferry is one thing and of the bridge another; which disproves their position. Til legislature regulated the ferry, but if it should undertake to reg ulate the toll-men, the plaintiffs would deny its authority : anc justly ; but they would rely, not on the assignment of the ferry, but on their own charter.
The case is stripped of the ferry rights, and the question *431 must be, whether, by the acts of 1784 and 1791, a contract was made restraining the legislature from granting oui bridge. Is the act of 1784 impaired by that of 1827, or is the thing granted re-asserted ?
We might rely on the plaintiffs’ own view of the case. They have not relied on an exclusive right as derived from their charter, but they try to connect their charter with the college right. They cite a case from Palmer, to show that a bridge may be substituted for a ferry ; but in Pain v. Patrick, 3 Mod. 294, it is held, that the owner of a ferry cannot convey a right to build a bridge.
Their charter allows them to erect a bridge at a particular place, where the ferry then was. The landing-places were well known. If their grant were construed most against the grantors, it would not give a right to take toll at any other place. They will not contend that they can erect a bridge off of the precise spot where the old ferry was kept. The fallacy is, they do not consider themselves as the grantees of a bridge with the right to take toll of persons going over it, but they say they have a right to take toll of all persons passing between Charles-town square and Boston ; and they liken their rights to those of a mill, to which all persons belonging to the manor must carry their grain ; they say they have a right to make people pass over their bridge, and not merely to take toll of those who do pass. That their charter will not bear this construction, is manifest from the authorities cited. 2 Bl. Qom. 347 ; The Elsebe, 5 Rob. Adm. R. 162. There is not a word in their grant, showing it to be exclusive. Every man taires such a grant subject to the right of the legislature to make a similar one whenever public convenience and necessity shall require it. But it is asked, would any person take such a charter for a brdge, if the legislature may immediately erect another bridge by the side of the first ? On the other hand, we may ask, whether the legislature would make such a grant as the plaintiffs contend for. But we may say further, that such a charter would be accepted ; for the citizens have confidence in the wisdom and integrity of the legislature ; they are willing to believe that the legislature will act as the public good shall demand, and will not injure an individual by a wanton exercise of *432 power. There was no necessity for making so extensive a grant as the plaintiffs claim ; the Cabots were offering to build a bridge from Boston to Lechmere Point on much better terms ; and the reason why their petition was not granted, was the sympathy felt for the inhabitants of Charlestown on account of their sufferings during the war.
The cases cited on the other side may be arranged in three classes. First, where the grant of the legislature is repealed or altered without the consent of the grantee, as in Fletcher v. Peck and Dartmouth College v. Woodward. Those are in no degree parallel to the present case. The plaintiffs say, that taking away their toll is equivalent to taking away their grant. But our act does not prevent their receiving toll. Making a similar grant is not granting the same thing. Another class relates to exclusive grants ; and to such the remarks of Chancellor Kent apply, in Gibbons v. Ogden. A third class is where the public have made a grant of a highway, and an individual, without any authority from the government, sets up another and diverts the custom, leaving the grantee • obliged to maintain his highway, while he is deprived of the benefit allowed him by the government.
Reliance has been placed on a dictum in the Year Book of 22 H. 6, that a ferry set up near an old one is a nuisance. This was said arguendo, and though it has been repeated in books since, it is not sustained by the authorities, in the sense in which the plaintiffs would have it understood. It referred to an interference by an individual acting without authority from the government. Willes, 512 ; Yard v. Ford, 2 Saund. 174 ; 1 Nott & M‘Cord, 395 ; 3 Murphy’s N. Car. Rep. 57. The case of Rex v. Butler, 3 Lev. 222, is conclusive on this point. The whole reasoning there proceeds on the ground, that the writ of ad quod damnum was surreptitiously obtained, and so the new market was a nuisance. It has been suggested, that an ad quod damnum is a matter of form ; that it is executed without notice. This is a mistake. The English newspapers of the present day contain advertisements in which the sheriff gives notice that he is about to execute such a writ. Upon a license granted after a writ of ad quod damnum duly *433 executed, a man sets up a market &c. with safety. Rex v. Montague, 4 Barn. & Cressw. 598.
We have no writ of ad quod damnum in our practice, but a hearing before the legislature is equivalent. The report of the committee of the legislature in 1792, negatived any exclusive right in the plaintiffs, but as a matter of bounty they recommended an extension of the time allowed them for receiving toll for passing their bridge, and whatever may have been the original grant, it should seem that this report was intended to put an end to the claim of an exclusive right, and the plaintiffs must take the extension in the terms in which it was given. There has been a contemporary and repeated construction of the plaintiffs’ right, and in which they have acquiesced. Their claim was made before the legislature when the West Boston and the Canal bridges were granted, each of which interfered greatly with their profits. The spur from the Canal bridge, it is said, leads from Charlestown to Cambridge ; but it likewise leads from Charlestown to Boston. An acquiescence in wrong may not give a right; but we allude to the fact as showing the general understanding of the community.
There is nothing in the English decisions that is inconsistent with the practice of our legislature ; and if there was, they could not control the practice and principles which have been held here from the settlement of the country. The usage here has always been, to make grants like the one in question, without giving any exclusive right. The case of Chadwick’s ferry settles no point of law. The legislature made provision for his indemnity, but otherwise it was not a question of right. In some instances the legislature give a privilege of taking shares in the new enterprise, in others a fixed sum is allowed ; not as a matter of right, but of discretion. If the doctrine on the other side is correct, the grants of most of the bridges about Boston were outrages upon private property ; in particular, the free bridge to South Boston. The turnpike from West Boston bridge to Watertown, was of the same character. The declared design of it was to draw travel from the turnpike leading from the Mill-dam to Watertown. Why has there been no prosecution before, unless from the general understanding that the legislature had a right to make these grants ?
*434 The plaintiffs argue, that a decision in our favor will put a stop to enterprise. On the contrary, that is the very genius of monopoly. History shows, that monopolies in England became intolerable, and they were swept away by the statutes of James. If the system had been practised on here, we should now have had the old ferry, instead of the plaintiffs’ bridge. A new invention always injures a previous one ; but improvements have gone steadily on in this country, and we trust will continue to make advances under our system of liberal compe tition.
Webster, in reply. The question before the Court is now to be discussed and settled upon strict principle applicable to private rights. The case is now where reason is to govern, and not declamation. Legislatures do not act under the same responsibility as judges. They may determine by simple ayes and noes ; but a judge must give reasons for his decision. It may not be improper to advert to general considerations of expediency, but they cannot have very great influence. The defendants talk of a free course of legislation, of free competition, as the source of public improvements. They would not, I trust, compete with us for our franchise. But how are public improvements promoted among us, except by private funds advanced upon a confidence reposed in the most delicate and strict observance of public faith ? Nothing is done here by the government itself, but every thing by individuals, under the sanction of the government; and the defendants would bring their liberal doctrines into conflict with rights thus established. I rejoice in an opportunity to resist the attempt to force these popular notions upon courts of justice.
The plaintiffs have a bridge, at which they receive toll ; the defendants place another bridge by the side of it and take two thirds of the toll; and the question is, whether this is an invasion of private rights. If the new bridge is not protected by the act of 1827, we say it is a nuisance at common law; if it is so protected,, then we say that that act is contrary to the constitutions of this State and of the United States.
Before considering these great questions, it may be well to dispose of some subordinate collateral matters.
The plaintiffs must be an existing corporation in order to *435 maintain this suit. The defendants say, that the original charter of the plaintiffs has expired, and that there has been no acceptance of the extension allowed by the act of 1791. The objection admits of several answers. First, if the 'damtiffs are not a corporation, it should have been pleaded in abatement. Secondly, the defendants’ own charter recognises the plaintiffs as a corporation. And thirdly, the plaintiffs have accepted the extension of their charter. If an act of incorporation is granted to individuals, organizing themselves under it is an acceptance of it; and if an additional act is passed, any thing done in con formity to it, which they could not have done without it, is an acceptance of the additional act. The plaintiffs have continued to act as a corporation ; which is conclusive evidence of such acceptance. But it is said we ought to have accepted sooner. What then ? It may be matter to be tried on a quo warranto, if the Commonwealth see fit to institute such process ; but it does not concern the defendants. Before the expiration of the first act, the second was expressly accepted by a vote ; and why was not this in season ? Further, the plaintiffs acted in a manner irreconcilable with the non-acceptance of the act, by discontinuing to take the double toll. It is objected however, that this was not until the West Boston bridge had been built. Witnesses in speaking of a transaction which took place more than thirty years ago, would naturally refer to something visible to fix the time ; but we believe that the plaintiffs discontinued the double toll immediately after the passing of the act, though they did not make the entry of the act on their books till 1802. Besides, the provision on this subject was not a condition precedent. Grants which are beneficial to a corporation, are presumed to be accepted. United States Bank v. Dandridge, 12 Wheat. 70. The act in question, so far as the plaintiffs’ assent to it could be of any avail, was beneficial to them. If they had had the power, they would have rejected the whole act ; but that they could not do, and the extension of their charter for thirty years was a benefit.
The defendants say, that the ferry was not a ferry by prescription. We have merely called it an ancient ferry. But whether it was by prescription or by grant, the law in regard to it is the same
*436 It is objected that the college have never assented to the act of 1791. They have received the annuity provided for by the act, and this is an assent. But their assent was not necessary. Their whole right to the ferry had been relinquished in 1785, and the question in 1792 was between the government and the plaintiffs only.
Other cases of questionable legislation have been enumerated on the part of the defendants. It is a very usual course for a man in fault, to resort to similar instances for his justification. There is a natural alliance between bad principle and bad practice. But the Court are not told of the ninety-nine cases in the hundred, in which the legislature have been sedulously attentive to the preservation of private rights.
First, it is said that if our construction of our charter is correct, the grant of West Boston bridge was a flagrant violation of our rights. Suppose it was so ; we complain now of a more flagrant violation. Is a former remote encroachment to justify an immediate and direct encroachment ? Forbearance in a questionable case does not affect the right. If the legislature did wrong in granting the West Boston bridge, they at the same time conferred a benefit in the extension of our charter, which furnished a sufficient reason for our acquiescence.
The counsel say, that in 1792, a committee of the legislature made a report, which was accepted, giving the negative to our claim to an exclusive right. The report is of no authority, — but what does it amount to ? That the act of 1784 “ is not an exclusive grant of the right to build over the waters of Charles river.” If the plaintiffs misconceived their rights, it does not follow that they have no rights. We do not now set up the claim which was made in 1792 ; our present claim and the report may well stand together.
The erection of Canal bridge too, it is said, was, accord ing to our principles, a violation of our rights, and yet we did not resist. Possibly the proprietors of Charles River bridge thought the interference was rather with West Boston bridge • and the division between that bridge and Canal bridge, of the burden of the college annuity, favors the idea. It is howevei sufficient to remark, that if in a doubtful case the plaintiffs did *437 not think it would be advantageous for them to contend, it does not conclude them in the present case.
In regard to Malden bridge, the Penny ferry seems to have nelonged to the town of Charlestown, and the inhabitants may have considered that their interest would be advanced by having it superseded by the bridge. And when this bridge was afterward injured by the grant of Chelsea bridge, it was provided in the act, upon the agreement of the parties, that a portion of the profits of Chelsea bridge should be paid to the proprietors of Malden bridge. But it is objected that no compensation was made to the owner of Winnesimet ferry for the damage occasioned by Chelsea bridge. It may be remarked in answer, that the bridge was between Chelsea and Charles-town, and the ferry was over an arm of the sea from Chelsea to a third town at a considerable distance from the bridge.
In the case of the free bridge to South Boston there was no memorial in behalf of the proprietors of the old South Boston bridge, and a majority in interest were in favor of the erection of the new bridge.
The two turnpike roads from Watertown to the Mill-dam and West Boston bridge, were both granted in the same year, and it was a.race between the parties, which should get a road first.
But none of these instances furnish authority for a court of latv.
Much has been said about odious monopolies. Is a bridge, a ferry, a fair, or a market, a monopoly ? The statute of James has not swrept them away. A monopoly is a grant of a benefit without any burden. Viner says, that a ferry or a bridge is not a monopoly, because there is a duty to be performed by the proprietor. Doubtless our predecessors, the Indians, had the perfect freedom of competition which the defendants now want to introduce ; but they had no bridges, no ferries. All the public improvements in the country have arisen from what the defendants call monopoly; from a grant by the public, of security for private funds, for the benefit of using them. We are asked if our ancestors would have granted to the college a right over the whole river. Undoubtedly they would ; and if they had foreseen the increase of popula *438 tion in the vicinity, with their anxious desire to encourage learning, they would have done it the more willingly.
We come now to the consideration of the real questions in the case.
The first question is, whether the college had any ferry right in 1785 ; —• whether by one or all of the previous grants, or by usage only is immaterial.
A ferry having been previously established between Boston and Charlestown, in 1640, the general court say, “ the ferry between Boston and Charlestown is granted to the college.” These words would be sufficient now to pass a ferry ; and at that period, it was not usual to be more full and formal in malting grants. A ferry will pass by any words which show such an intent. 1 Nott & M‘Cord, 393. The defendants say that this was a gratuity to the college. It may have been a gratuity, but it was not revocable. A gift executed is beyond the power of the legislature. This grant has been recognised by the government in 1650,1654, 1710, 1712,1781, and 1785. The act of 1781 (Si, 1780, c. 42,) regulating the ferry, imposes a heavy penalty on the college in case of negligence ; and yet the defendants say the college were subject to no burden. The statute proceeds upon the ground, that the college were liable to indictment, if the ferry were not properly kept. The power of even regulating the tolls is recognised by that statute to be in the college ; and yet it is said they had no franchise. In St. 1784, c. 53, § 5, “ a reasonable and annual compensation for the annual income of the ferry ” is saved to the college, after the bridge shall become the property of the Commonwealth. Is this a gratuity, or is it an express ac knowledgment of a pre-existing right, and a compensation foi the relinquishment of that right ? All these acts are confirmations of the grant, and yet it is argued, that they prove that the college had no right at all. As well may it be contended, that th° several ratifications of magna charta abrogated it.
It has been objected, that the college could not take under the grant, not being a corporation until 1650. That may have been the reason then why a confirmation was made.
It is urged that the government have constantly interfered in regard to the ferry. But they took none of the revenue, *439 ncr ever resumed the franchise ; all their acts were merely regulation.
The defendants distinguished between a grant of the franchise and of the profits and revenues. But the distinction does not aid them. All that the government could grant to an intiividual was the benefit. There is nothing beneficial in a ferry except the tolls, the revenue ; and a grant of the revenue carries with it an obligation to support the ferry. The government did not sustain this ferry ; they built no boats, they merely regulated them ; they derived no profit from the tolls. The actual management and revenue have always been with the college. If using the whole franchise for a hundred and forty years, does not give a title, it will be difficult to know who in this country has a title.
Next, what is the extent of the ferry or franchise, up and down the river ? It is sufficient for us to show that it is broad enough to cover the place where the defendants have built their bridge, and that so the bridge would have been a nuisance to the ferry.
The grant was of a ferry between Boston and Charlestown ; and this in legal contemplation takes the whole of the two ter mini. It covers the whole water between these two towns. Suppose that no ferry or bridge had subsisted between these towns, and an individual should to-day purchase of the government “ the ferry between Boston and Charlestown ” ; how would the grant be interpreted ? It must either include the whole water between Boston and Charlestown, or it has no limits. Would the Court hold that the same prerogative could to-morrow grant another ferry by the side of it ? The case is analogous to that of a market. If a market on the same day is set up too near an ancient market, it is by intendment of law a nuisance, but if on another day, whether nuisance or not is a question of evidence. So a ferry established between the same termini, is by intendment of law a nuisance.
It is cleat law, that it is a nuisance to set up a ferry so near another as to draw away the toll. This doctrine, the defendants say, is traced to a single dictum in the Year Books. That would only prove that it was too plain to admit of dispute. But it rests on other authority. The case in Hardres, as re *440 versed by Hale, acknowledges the law as above stated $ aim it is recognised by Brooke, Rolle, Comyns, Blackstone, Kent, and the court in South Carolina. '
Where a thing is granted, all that is necessary to the enjoyment of it goes with it. If an office is granted by name, all the powers, duties and fees belonging to it pass. So of a ferry. If an individual grants a ferry, all his rights accompany it; and it is settled, that the right of a ferry, in local extent, is exclusive, so far as to put down injurious competition. How does the grant to the college in 1640 carry the beneficial part, the tolls ? They are not mentioned in the grant; but it has not been pretended that the college took only the privilege to row and scull. The law says, that the right to toll goes with the ferry by implication ; but it says so no more than it does, that in like manner passes the right to put down injurious competition. Both are equally incidents to a ferry. The profits of this ferry were originally 40Z. ; why is it not contended that the government might have taken all the excess afterwards, on the ground that they did not intend to give more than that sum ? If they may take back a part of what is granted by implication only, they may the whole.
The defendants however contend, that it can be made out by authority, that the ferry is limited to the landing-places, and a case in Saville is referred to as overturning the doctrine of Kent and others before named. The question there was, whether the owner of a ferry had any right to the water, except to navigate it. We contend for no other right. “ A ferry is in respect to the landing-places,means only that there must be a place to land. Com. Dig. Piscary, B.
The grant in 1640 was not of a ferry de novo, but of a franchise already in exercise. What were its rights at that time ? History shows that it was the sole ferry between Boston and Charlestown, and that it was in the hands of a lessee of the government at a rent of 40Z. a year. Could the government have granted another ferry between these towns, to be used before the lease to Converse had expired ? The lease gave him “ the ferry between Boston and Charlestown, to have the sole transporting of passengers and cattle from one side to the other.”
*441 If this were doubtful, are we to forget that there has been a long continued usage showing the extent of the grant ? No rival ferry was attempted to be set up during the space of 145 years. In Blankley v. Winstanley, 3 T. R. 279, a usage under a charter is considered as the true exposition of the extent of the charter, and it is there held to override a by-law. In 1785, the college, if they had not assented to the erection of Charles River bridge, might have sued the plaintiffs, and their charter would not have protected them. Chadwick v. Havernill Bridge, 2 Dane’s Abr. 686. In Tripp v. Frank, 4 T. R. 668, it is conceded, that if it had been the duty of the plaintiffs to transport all passengers from Kingston upon Hull, to Barrow, as well as to Barton, they would have been entitled to all the tolls. So here, we are obliged to transport all passengers between Boston and Charlestown, the termini of our ferry, and our rights are commensurate with our duties.
Next; if the college had, in 1785, the right of the ferry to the extent above claimed, we are to consider what was the character of the transaction which took place in that year. It is entitled to receive a reasonable construction ; such as will protect the parties to it, and carry their intent into effect.
The petitioners for a bridge could not erect one without the consent of the college, as it would have been a nuisance to the ferry ; the college had no authority to build one to the obstruction of the navigable waters, as it would have been a usurpation against the government, and the government had not the power to take away the ferry-tolls from the college. There were three parties then, neither of which could alone erect the bridge. The petitioners therefore were obliged to obtain from the government a license to obstruct the navigable waters, and from the college, a right to take the toll. Under these circumstances the act of 1784 was passed. The college were a party to the act; that is, they assented to it. A subsequent ratification implies a previous assent. It was not necessary that they should be named as a party in the act itself. They stop their ferry-boats, and accept of the annuity provided for them by way of compensation. This was a ratifica tion, and, in connexion with the act, was a conveyance of their right in the franchise, to the plaintiffs for the term of forty *442 years, and to the government ever afterwards. The conve) - anee was founded on a consideration, in respect both to the college and the Commonwealth ; an annuity being granted to the one, and a public benefit conferred on the other, at the plaintiffs’ expense. It has been said that the annuity was payable out of the tolls, and so the consideration proceeded from the public. On the contrary, the act makes it an absolute charge on the plaintiffs, and it must be paid even if their bridge should in any way be destroyed or rendered unproductive. We admit that there is no assignment in the forms of the common law 5 but the transaction is not to be looked at in a technical view ; the intent of the parties is to be regarded. It is a case of substitution of one person to another as owner of the ferry, through an act of the legislature, which is binding on all persons who assent to it. The transaction may be considered as a purchase and surrender of the ferry to the use of the plaintiffs for forty years, with a reversion to the government, the plaintiffs paying the college an annuity of 200Z. during the term, and the government making a reasonable compensation afterward for what would have been the income of the ferry.
The case in Palmer, 78, is in point. If the legislature had said “ whereas the college have a ferry, now leave is granted to them to build abridge,” the bridge would have the same extent of right as the ferry. It would be merely substituting one mode of transportation for another ; like sail-boats for rowboats. So that the plaintiffs, holding the right of the college, have the same extent of franchise, as if the college had been authorized to substitute a bridge for their ferry.
But we need not rely on the ground of a transfer of the ferry. We stand upon a grant from the legislature ; and if necessary, the Court will refer to the ferry, or suppose that our charter refers to it, as descriptive of the extent of the grant.
We say that the recent act, incorporating the proprietors of Warren bridge, impairs the rights vested in us by our charter. Our property is taken from us, without any suitable provision for compensation.
It is unnecessary to argue that an act of the legislature, impairing the obligation of a contract, is unconstitutional; or that a grant is a contract. The whole ground is covered by the *443 cases of Vanhorne’s Lessee v. Dorrance, Fletcher v. Peck, New Jersey v. Wilson and Dartmouth College v. Woodward. This last was the case of a charity for public objects, and it was argued that the government might therefore control it; but the answer was, that the plaintiffs were a private corporation, though for the benefit of the public. The franchise now in question is granted to a private civil corporation ; not to a public corporation over which the legislature have a control. In 4 Wheat. 669, in speaking of canal, bridge and turnpike corporations, Story J. says, “ In all these cases, the uses may, in a certain sense, be called public, but the corporations are private ; as much so indeed as if the franchises were vested in a single person.” Any notion, therefore, which may be entertained, that the grant of our bridge is connected with the public benefit, is of no consequence. The question concerns a franchise. We contend that the late act is a resumption of a part of a franchise, and all argument about a free course of legislation is irrelevant; it is a question of right.
The same rule of construction prevails in a question between the government and their grantee, as between individuals. In a case of contract, they stand on equal ground. The rule as to grants of the crown being construed in favor of the crown, is explained in the Dartmouth college case. If on the solicitation of a party, a grant is made injurious to the crown, it is considered that the king was deceived ; and hence the practice of inserting the words mero motu in crown grants, in order to entitle the grantee to a more liberal construction. But the application of the rule to parliamentary grants, was questioned by Eyre C. J. in Boulton v. Bull, 2 H. Bl. 500. Ours is a grant of that sort. And besides, the English rule was never adopted in this Commonwealth.
The plaintiffs being a private corporation, from the nature of the case, our grant must be exclusive to some extent; and this is a question of construction. The charter allows the erection of a bridge “ in the place where the ferry between Boston and Charlestown is now kept.” The plain implication is, that the bridge was to be a substitute for the ferry. Had the words been “ in place of,” that is, expressly as a substitute, they would not have been stronger. f,£ Where *444 the ferry is kept,” is descriptive »f the franchise. It is immaterial whether we do or do not make out a privity between the proprietors of the ferry and those of the ~>ridge. Without such privity, the act authorizing the erectior. of a bridge in the place where a ferry is kept, gives the same bcal extent. Our grant either has no extent beyond the. width of our bridge, or it has the common law extent, of keeping down injurious competition, or it has the same extent as the old ferry. If we can go a single foot beyond our planks, there can be no question in this case. All the arguments showing that a ferry generally, or this one in particular, is exclusive to a certain extent, apply equally to the bridge, indeed with greater force, because a greater outlay of capital was necessary in the case of the bridge, and greater risk was incurred.
Assuming what seems to be admitted, that if the defendants were acting merely as individuals, without any license from the legislature, they would be liable to us in an action for a nuisance, (and yet if we cannot go beyond the length of our planks, it should seem to be doubtful,) the question is, whether the legislature could authorize them to build their bridge. In our view, if an action would have lain, it is impossible to maintain that an act of the legislature can protect the defendants. By no construction can it take from the plaintiffs any right which they could before have enforced.
It is admitted that this franchise is private property, and that the Warren bridge takes two thirds of our income. The whole effect of the recent act is to take the fruits and profits of the franchise ; for it is clear, that it does not resume the license to obstruct navigation. It is a mere question of money between the treasurer of the Commonwealth, and the proprietors of Charles River bridge. As soon as the proprietors of the Warren bridge shall be reimbursed their expenses, the tolls received at that bridge go to the government. The legislature put their hands into our toll-dish and take the lion’s part. They in effect say, this is a day of free competition, and we will enter into competition with you for the money n your till. If there were no constitution, such an act could have no force.
The legislature cannot grant what they do not possess. The *445 confusion in this case arises from considering these acts of the legislature as laws ; whereas they are grants, which are wholly different. A law is a rule prescribed for the government of the subject; a grant is a donation. In laws, the last in order of time repeals the first; in grants, the first stands unaffected by the last. Every grant supposes that the grantor has parted with his right, and that he will not re-assert it. The question then is, whether the defendants are protected by their act of incorporation in doing what they have done ; if they are not, their bridge may be abated. We say that a right to build and maintain a bridge for the time stated, with a right to keep down contiguous and injurious competition, has been granted to us ; and if the legislature meant to grant to the defendants a franchise within those limits, they have attempted to grant what they had before granted to us. If our franchise does not extend above the supposed franchise of the defendants, we have no ground of complaint. The case of Jackson v. Catlin, 2 Johns. R. 248 and 8 Johns. R. 406, establishes the principle, that the terms used in a legislative grant, must, as in other grants, be construed with reference to the power of the grantor, and must be considered as not granting what the legislature had not to grant.
But it is said that in England, after a writ of ad quod damnum executed, a grant of a second market &c. will be valid, and that as we have no such process, a second grant without such a writ will be sustained. [C. J. Or rather that the course of proceedings before our legislature is equivalent to an ad quod damnum.] An ad quod damnum is a judicial process, by which inquiry is made upon the oath of honest and lawful men, whether setting up a market &c. will be to the damage of the king or others, and if to the damage, then to what damage. There is nothing of this sort before a committee of the legislature. By the constitution, the legislature cannot exercise judicial powers. We have a better protection. The jury is our ad quod damnum. We have usually in our acts a provision for indemnity to persons injured, and for a trial by jury : and this is the course now generally pursued in England. It has been decided, that a legislative act appropriating private property to public uses, is void, unless it contains a *446 provision for a simultaneous compensation. This Court nave preceded, and the Court in New York have followed, in establishing this principle ; and the reason is, that there is no security in legislative justice, but by holding such acts to be void. The inquiry by the legislature, the supposed ad quod damnum which is to settle our right, is by the party who are to derive a benefit from stripping us of our rights. The legislature cannot go further than to say, that a measure will be of public convenience and necessity; if they are to determine that it will not prejudice private rights, and such decision is to be conclusive, the provision in the constitution is nugatory and inoperative.
But the counsel mistake in regard to the English law of ad quod damnum. A grant after the execution of such a writ, is not conclusive of the right of the grantee. Mosley v. Walker, 7 Bam. & Cressw. 41, and Mosley v. Chadwick, ib.L 47, note ; Hale De Portibus Maris, in Hargr. Tr. 59. But it is proper that such a writ should be issued, in order that the king may not act without apparent reason. He would not intentionally grant what does not belong to him, and thereby put the true proprietor to his action. But the doctrine is made clear by the provision for a scire facias, at the suit of the party, to repeal the second patent, where the sane thing has been grant ed to two patentees. If a scire facias will be issued in such case, a fortiori will an action lie while the second patent remains unrepealed.
But however this may be, it is plain, that the legislature of Massachusetts cannot make a grant which shall be conclusive of the right of the grantee. By the constitution, on a question of property, every subject has a right to a trial by jury ; and if so, how can a hearing before a committee of the legislature be supposed to be conclusive ? The defendants say, that our property has not been taken ; that what we call property, is not property. We have a right to a judicial trial of that question.
Then is property taken by the government from the plaintiffs by the late act ? The constitution does not say land, or real estate or personal estate, but it uses the most general word, property. Is a franchise property ? The sum of 20,000 dollars a year is taken from the plaintiffs. Is this property ? B *447 the defendants had taken this without a license from the legislature, it is admitted that we should have had a right of action ; and for what ? for property. It is said on the other side, that our property is not taken, but that our complaint arises from a justifiable use of the public’s property, and that our loss is damnum absque injuria. Not so. Suppose our franchise, to the extent which we claim, had been limited by monuments on the banks of the river, and the legislature, reciting a public exigency for another bridge, should thereupon authorize a bridge within those limits ; would it not be appropriating our franchise in whole or in part ? And if so, it is an appropriation of property. They take our franchise, and the proceeds of our franchise. Both are property. The franchise may descend or be conveyed, and in other respects has the incidents of property. The provision in the constitution as to taking private property for public use, is to be construed liberally, or at least fairly for the subject. Our franchise is clearly taken by the recent act. Is it not appropriated to the public use ? If not, the legislature had no right to take it all.
But further, we contend that the power of the legislature to pass such an act as the one in question, is taken away by the constitution of the United States.
A grant is admitted to be a contract. The defendants say our charter is a mere license to build a bridge. Be it so ; a license is a contract. Our grant or license is for a valuable consideration ; for services to be rendered. It operates as a covenant for quiet enjoyment.
As the legislature could not make a grant inconsistent with a previous grant, the defendants must say, either that our franchise does not extend beyond the planks of our bridge, or that the legislature retained a tacit right to resume their grant. There is no evidence of such a reservation. Suppose our limits up and down the river had been defined; could the legislature, upon any tacit reservation or supposed public exigency, have granted other bridges within those limits ? It will not be asserted. And yet in fact such limits are fixed. The words of the grant, by necessary implication, limit the distance to which our franchise shall reach ; and if not, the law settles the extent. If the tolls of a ferry or bridge are not fixed by the grant, the *448 grantee may take reasonable tolls. So there must be a reasonable construction as to the extent of the franchise. The law says, a rival ferry or bridge shall not be set up so near as to take away the custom. And this too is to be construed reasonably. If we have any exclusive right beyond our planks, it must cover the place where the new bridge is erected. The direct and necessary effect of the new bridge is to take away our custom, construing these terms most favorably for the defendants.
There would be more reason to contend, as a matter of public necessity, that our bridge should be removed as obstructing navigation, than that our money should be taken. But whatever might be the plea of necessity in that case, the right of navigation, the peculiar right of the government, is not re sumed ; while our money, the fruits of our franchise, which could in no way be affected by the public exigences, is taken, from us. It is said our doctrine would obstruct public improvements. That we deny. If another bridge was wanted, it might have been had, without involving the necessity of taking away our revenue. The government might have built it at our expense, and let us take the tolls.
The question of public necessity requiring another bridge, is not now open. We deny the fact, and we deny the competency of this Court to try the question of convenience, or the effect of it if proved. Public necessity is apt to be public feeling, and on this rock we are in danger of making shipwreck of the bill of rights. In Martin v. Commonwealth, 1 Mass. R. 357, Parsons says, that prerogative is more dangerous in a popular government than in a monarchy ; that in England, it is the cause of one against the whole, here it is the cause of all against one ; and therefore here it is of more importance that judicial courts should watch the claim of prerogative more strictly. In Newburgh Turnpike Co. v. Miller, 5 Johns. Ch. R. 109, which was the case of a turnpike road, Chancellor Kent lays out of view all considerations of public convenience or necessity, “ as altogether inapplicable to the question of right.” In Mosley v. Walker, 7 Barn. & Cressw. 52, Lord Tenterden says, “ If the ancient market has been held in the public street, can we say that because population and commerce have increased, and that a greater number <■£ carriages pass through the *449 street in modern times than passed in ancient times, the lord, therefore, is to lose his franchise ?” We take private property for public use move freely in this country than would be toler ated in England. We take it even for speculation.
In regard to the compensation provided for in the act of 1527, it is to be made to any person or corporation whose real estate shall be taken by the defendants. The word property, which is the constitutional word, is said to have been excluded ex industria ; at any rate, it is not in the statute. On examining the precedents of private acts in England, in similar cases, it will be found, that in regard to indemnity to persons whose rights are affected, they embrace every species of interest.
But it is contended on the other side, that the legislature have not taken away any right belonging to us. On what ground then do they require the Warren bridge to pay half of the annuity to the college ? Why make those proprietors pay our debts,, if they have not taken our property ? It would be difficult to find in the history of our legislation an act like this. The legislature acknowledge, on the face of the act, that our right is taken, and they undertake to debar us from a trial by jury and to judge themselves of the compensation to be made to us. They direct the annual sum of 100L to he paid for us, and they take from us the annual sum of 20,000 dollars.
In case the Court shall think that our rights are invaded, it will not be necessary to destroy the new bridge. The decision need not run against the public convenience. The bridge may be allowed to stand, as the legislature have given their consent to the obstruction of navigation, and the Court can adjudge the defendants to be our trustees. Such a decree would perhaps lead to an agreement between the parties.
Some general remarks have been made, to show the solicitude of courts not to overturn a legislative act unless its unconstitutionality is manifest. Certainly if a judge has doubts, they will weigh in favor of the act. But h should be considered, that all cases of this sort will involve some doubt; for it is not to be supposed that the legislature will pass an act which is palpably unconstitutional. The correct ground is this, that the Court shall interfere and declare an act to be void, where the case, which may have been doubtful, shall be made out to be
*450 Jan. 12th, 1830.
clear by examination. Besides, members of the legislatme sometimes vote for a law, of the constitutionality of which they are in doubt, upon the consideration that the question may be determined by the judiciary power. This act of 1827 was passed in the house of representatives by a majority of five or six votes. We could show, if it were proper, that more than six members voted for it because the unconstitutionality of it was doubtful; leaving it to this Court to determine the question. Now if the legislature are to pass a law because its unconstitutionality is doubtful, and the judge is to hold it valid because its unconstitutionality is doubtful, in what a predicament is the citizen placed. The legislature pass it de bene esse ; if the question is not met here and decided upon principle, then the responsibility rests nowhere, and the constitutional provision for annulling an act, instead of a shield, is a sword. It is the privilege of an American judge to decide on constitutional questions. It has raised the dignity of the judicial station. Without entertaining an ill opinion of legislative bodies, it is no disparagement of them to say, that judicial tri bunals are the only ones suitable for the investigation of difficult questions of private right.
The case was continued nisi, and during the November term, 1829, the judges delivered their opinions seriatim.
Morton J.
The plaintiffs, in their bill, complain that the defendants are engaged in erecting a bridge across Charles river, which, when erected, will divert the travel from th»5 plaintiffs’ bridge, and as to them will be a nuisance. And they pray for a perpetual injunction against the defendants, to restrain them from completing the bridge which they are employed in constructing, and also from suffering passengers to go over the same.
When the bill was filed, the plaintiffs moved for an immediate injunction to prohibit the defendants from further proceeding m the construction of their bridge, until they should file an answer to the bill and there should be a hearing and final decision upon the merits of the case. This question was fully argued and duly considered by the Court. And it was determined, that under the statute of 1827, c. 38, “ giving relief in equity in cases of waste and nuisance,” this Court had juris *451 diction of the case, and possessed the power to grant injunctions to prevent the creation of nuisances, as well as to abate them when created ; but that the present was not such a clear and incontrovertible case of nuisance, or one of such urgent necessity, as to call for the exercise of that extraordinary power which must necessarily be founded on a prejudication of the case. No further opinion was then given or formed in relation to the important question now presented for our consideration, than that it was not so clear and easy of solution as to admit of even a temporary decision, without an answer from the defendants, and a full hearing upon the bill and answer.
Since the commencement of this suit, the defendants’ bridge has been completed and is in use. The effects which the plaintiffs apprehended from it have been fully realized, in the diversion of a large portion of travel from their bridge.
The early measures adopted to restrain and prohibit the erection of the new bridge, fully apprized the defendants of the grounds and extent of the plaintiffs’ claims. And the defendants, with full knowledge of the question raised in relation to their authority, having chosen to proceed rather than await the decision of this tribunal, have placed themselves upon their strict constitutional rights, and can have no reason to complain or expect sympathy, should their authority turn out to be void, their bridge be decided to be a nuisance, and a forcible abatement of it by the arm of civil power, be decreed.
The Warren bridge, being over a navigable river or arm of the sea, is clearly a nuisance, unless authority to erect it be derived from the Commonwealth. But if unauthorized, it is a nuisance of such a public nature, that the plaintiffs cannot complain of it, in this form, unless their rights are injuriously affected by it. A public nuisance is the subject of indictment, but not of private action at law or in equity, unless special damage be sustained.
An authority to erect-a bridge over navigable waters may" be valid as to the public, so as to bar an indictment and prevent an abatement of it as a public nuisance, and yet be void as to individuals whose property is destroyed or private rights vio lated by it.
It appears by the bills as well as answers, that the Warren *452 oridge was erected under the authority of an act of the legisla ture of the Commonwealth. And it is not pretended that the defendants have failed to avail themselves of the provisions of the act, or in any way varied from or exceeded the powers vested in them by it.
The question which is distinctly presented for our decision, and which must necessarily be directly met in the adjudication of this case, relates to the validity of the defendants’ charter. Is the “ Act to establish the Warren Bridge Corporation,” passed on the 12th of March, 1828, valid and operative, or null and void ? It purports to authorize the construction of a bridge over the navigable waters of Charles river. It is an act of the highest legislative power of the Commonwealth, and must have force as a law, unless the legislature, in passing it, transcended their powers, or unless it contravenes some express provision of the constitution of this State or of the United States.
It is an axiom in our government, that all legitimate power emanates from the people. Legislators act by delegated authority, and only as the agents of the people. The constitution contains the grant of their powers. If they exercise any not contained in this instrument, it is usurpation. And such acts are void for the want of authority to make or pass them.
Navigable waters are public property, and the superintendence and regulation of them and of all other means of communication between different parts of the Commonwealth, clearly come within the general powers vested in our legislature. Grot. bk. 2, c. 3, § 9 ; Vattel, bk. 1, § 100, 244; 1 Bl. Com. 264 ; 2 Inst. 624 ; 1 Hawk. P. C. c. 76, § 1 ; Hale De Jure Maris, bk. 3, § 9. The grant of the charter of the Warren bridge is therefore within the general scope of legislative authority, and is not a case of excess of power. So far as the charter operates as a license to throw an obstruction across a navigable river, and so far as the public interest is concerned, it seems to be a valid act. Whatever may be the opinion of the Court as to its effect upon the plaintiffs’ rights, the defendants ought to be protected from a public prosecution, and this elegant specimen of convenience and skill in this branch of architecture be spared from a forcible abatement as *453 a public nuisance. Should the plaintiffs prevail, it is hoped the Court will find some adequate mode of redress consistent with the preservation of this great public accommodation.
The act incorporating the proprietors of the Warren bridge contains in itself no provisions prohibited by the constitution ; and having been passed in pursuance of the general powers vested in the legislative department by the people, it can be avoided only by showing that there existed in this particular case some extraneous constitutional impediment to its enactment. If such impediment exists, it must have been created by the legislature itself. Having been invested with the power, it could not be divested but by its own act, or an act of the sovereign power of the people in altering the constitution itself. The legislature can divest itself of power and bind successive legislatures, only by some act in the nature of a compact. If one legislative body makes a valid grant or contract of any kind, it would be inconsistent with the first principles of natural justice, as well as of constitutional law, for a succeeding legislature to resume the grant or avoid the contract.
The plaintiffs claim under a grant from the government, either immediately to themselves, or derived to them through the medium of Harvard College. That these grants vested in the respective grantees, beneficial interests, and constituted contracts between them and the Commonwealth, is too clear and well settled to be questioned. New Jersey v. Wilson, 7 Cranch, 164 ; Terrett v. Taylor, 9 Cranch, 49 ; Dartmouth College v. Woodward, 4 Wheat. 560.
The plaintiffs contend that the defendants’ charter is invalid, because it is inconsistent with the last clause of the tenth section of the constitution of the United States, with the fifth article of the amendments to the same, and with the tenth article of the declaration of rights of this Commonwealth. They attempt to show that the grant to the defendants impairs the obligation of the contract existing between the Commonwealth and themselves ; and also that their private property has been taken and appropriated to public uses without a just and reasonable compensation.
Whether the grant to the defendants interferes with the vested rights of the plaintiffs under the former grants, must de *454 pend upon the true construction of the several acts of the legislature making those grants.
The plaintiffs claim an exclusive right to take toll of all persons passing over Charles river between .Charlestown and Boston. This right they derive to themselves in two ways. First, by a legislative grant to Harvard College and an assignment by the college to themselves. Secondly, by a direct grant from the government to themselves.
In relation to the first branch of the subject two inquiries naturally suggest themselves. First, what was the extent of the grant to Harvard College, and what did the grantees take under it ? Secondly, has the right or interest which the college took, whatever may have been its extent, passed to the plaintiffs ?
The grant to the college, as made, confirmed and explained in several legislative acts, was of a ferry, or of the income or revenue of a ferry. The import and meaning of these several ancient acts have been fully discussed, and several questions raised in relation to them, which it will be proper briefly to consider.
Whether we refer to the act of 1640, which purports to be a direct grant of the ferry, or to the subsequent acts recognizing and confirming the former grant, as of the income or revenue of the ferry, it is manifest that some permanent indefeasible interest was intended to be passed, and did actually vest in the college. To construe these acts into mere gratuities or donations during the pleasure of the legislature, would be equally irreconcilable with the beneficent objects which they have in view, the terms of the acts, and the practical construction of them for more than a century and a half.
Ferries in this country, as well as in England, are the subject of property, and like other incorporeal hereditaments, are capable of transmission by grant or devise. In England their original source is the prerogative of the Crown. Churchman v. Tunstal, Hardr. 163. But in this State they can only be derived from the legislature.
In the further discussion of this subject I shall proceed upon the assumption, that the franchise of the ferry was the proper- *455 t> of the college previous to and until the grant of the plaintiffs’ charter.
The extent of this franchise or right must depend upon the construction of the act by which it was created. And it is apparent from an examination of the several acts and the usage under them, that the college took and held the franchise subject to the general superintendence and regulation of the legislature of the Commonwealth. Neither the management of the ferry, nor the number of boats to be employed, nor the rate of toll, is established in either of these acts. Was the power to regulate these subjects granted to the college, or reserved to the legislature ? If the former, then public convenience, so far as related to the transportation across the river by this ferry, was made to depend upon the pleasure of an interested corporation, instead of the sovereign power of the State. It cannot be supposed, that the college had the exclusive right to the transportation across the river, and also the unlimited power to fix the rate of toll for such transportation.
The college, in accepting the right granted, assumed corresponding obligations. If they were to receive the profits of the ferry, they were bound to furnish reasonable accommodations for the public ; to submit to the general regulations of ferries throughout the State ; and to take such just and reasonable toll as from time to time the legislature should establish. Such seems to be the tenure by which ferries were generally holden, except m cases where the toll or other stipulations were fixed in the grant.
The grant of a ferry confers on the grantees an exclusive right, but the extent of the right must depend upon the terms of the grant.
The grant of an exclusive right to take toll at a ferry, or bridge, or turnpike, is not a monopoly, which is deemed so odious in law, nor one of the particular and exclusive privileges distinct from those of the community, which are reprobated in our bill of rights. The grant is upon a condition precedent, which requires the performance of services beneficial to the public, before the right to take toll vests.
In all cases the legislature may make the grant more or less exclusive, and more or less extensive, according to their opin *456 ion of the expediency of the measure or the necessity of the case. Originally, the legislature might have established a ferry with an exclusive right to the transportation of all passengers across Charles river in its whole extent, or one with the right to all the transportation between Charlestown and Boston, or several between those two towns, each with a right only to take toll of such passengers as might choose to use it.
This, though an ancient, is not a prescriptive ferry. Co Lit. 115 a; Hull v. Horner, Cowp. 102. Its commencement is clearly shown. But prescription always presupposes a grant; and I can perceive no difference between the two, except in the mode of proof. In prescription, the proof is by the use, and the right presumed to be granted is co-extensive with the use. If the grant itself be produced, the extent must be determined by the terms of the grant. In the case before us, if a prescription had been shown for the college to transport across Charles river all passengers between Charles-town and Boston, it would have been evidence that a grant to that extent had been made. So if a deed, conveying the same exclusive right, had been produced, it would necessarily have established the same right in the college. The only dif ference would have been in the mode of proof.
The grant to the college is of record. The history of the origin and continuance of the ferry is well known, and clearly shown in the exhibits filed in the case.
In 1630, the governor was ordered to permit the first applicant “ to set up a ferry betwixt Boston and Charlton,” at a certain rate of toll.
In 1633, Mr. Brown was allowed to keep a ferry over Charles river against his house. Whether this was instead of, or in addition to the former proposed ferry, does not clearly appear.
In 1635, a ferry was established “ on Boston side to trans port men to Charlton and Winnesimet.”
In 1637, the governor and treasurer were empowered to let the ferry between Boston and Charlestown at a rent of 401. per annum, for the term of three years. In pursuance of this authority the ferry was let to a man by the name of Converse.
In 1638, “ a ferry is appointed from Boston to Winnesimit, *457 Noddle’s Island and the ships,—the person to be appointed by the magistrates of Boston.”
In 1640, the treasurer and others were empowered “ to let the ferry between. Boston and Charlestown to whom they pleased; after the expiration of the subsisting lease ” to Converse.
In August, 1640, “ the ferry between Boston and Charles-town is granted to the college.”
Ir 1654 and 1655, the existence and validity of the grant is recognised and continued under the name of the profit or rent of the ferry.
It is manifest that the right of the college to the ferry was not founded on prescription. And the plaintiffs cannot now call to their aid any principles or reasoning peculiar to this kind of title, oi any rules of evidence applicable to this mode of proof.
By the grant to the college it is contended, that the exclusive right of transportation between Boston and Charlestown passed. The case of Tripp v. Frank, 4 T. R. 666, is relied upon to support this position. But a very cursory examination of that case will show, that the plaintiffs can derive no aid from it, in support of their construction of this grant. That was a case of prescription, and not of express grant. In that case the plaintiff proved an exclusive prescriptive right to the transportation of persons across the Humber between Hull and Barton ; but in this, the question in controversy is, whether the exclusive right of transportation between Boston and Charlestown was granted or not. In that, the exclusive right between the two towns was not disputed, but the only question was, whether a transportation from one of those towns obliquely across the river to another town two miles lower down, was a violation of the plaintiff’s exclusive right. The court held that it was not, and that the transportation across the river from one of those towns to any point above or below the other, unless done to avoid the plaintiff’s ferry and in fraud of his right, was not an infringement of his franchise.
What then is the true meaning of this grant to the college ?
It was not the creation of a new franchise, the extent and "units of which were then to be established ; but it was the *458 grant of an old one, with its then existing rights and privileges. The terms “ the ferry,” as used in the grant, clearly recognise its pre-existence. No new rights or privileges were then added, nor was there any attempt to fix or define the old ones But it passed just as it existed at the time of the grant.
The prior acts creating and regulating this ferry are so brief and general, that it is very difficult to ascertain the precise meaning of them, or the extent of the franchise which was thereby granted. Indeed it is not probable that any definite limits were intended to be affixed to it. This seems to me to be a case in which usage and a contemporary practical exposition of the grant are admissible evidence, and furnish a pretty safe guide in its construction. That the tendency of this evidence, so far as we have gone into it, is to support the exclusive right to the extent claimed, I think cannot be doubted. But upon this it is not necessary to give an opinion, for the view which I take of the subsequent facts of the case renders a decision of this point, or the further investigation of this part of the subject, unnecessary.
For I am clearly of opinion, that the franchise of the ferry, or the right of the college in it, whatever might have been its extent, never passed to the plaintiffs. And further, had it passed, I think they could not avail themselves of it in support of this bill.
The right of the college did not vest in the plaintiffs. The act of the legislature did not pass it. The legislature itself had no power to transfer it. It could only pass by the act of the corporation of Harvard College. The constitution nowhere invests any branch of the government with the despotic power of transferring the property of one man or corporation to another. Such an act would be subversive of the principal ends of government, of the fundamental laws of the social compact, and of the principles of reason and moral rectitude, as well as irreconcilable with the letter and spirit of our national and State constitutions. And the legislature could no more take private property from one person and vest it in another, with an indemnity, than without one. It is only in case of public exigency that private property can be taken, and then only for public use, and upon making a just and reasonable *459 compensation. There is not the slightest evidence of any intention or attempt on the part of the legislature, to transfer any property or right of the college to the proprietors of Charles River bridge.
If the plaintiffs ever acquired the franchise of the ferry, it must have been by purchase. This incorporeal hereditament could only pass by deed. There exists no written instrument under seal, and it is not pretended that there is any legal conveyance of this estate.
It is true, that in equity an agreement to convey might be holden to be equivalent to an actual conveyance. But where is the evidence of any contract between these parties ? It is not in writing. And I have seen no proof of any kind, that any negotiation or treaty was ever entered into between them. There is, in short, nothing in the original application for the charter of Charles River bridge, in the proceedings upon that pplication, in the transactions of Harvard College, or in the plaintiffs’ act of incorporation itself, which has the slightest tendency to convince my mind, that there was any intention or desire in any of the parties to make a contract of sale or a transfer of the franchise of the ferry.
The charter of the Charles River bridge was a compact. The parties to it were the Commonwealth on one part and the corporation on the other. The charter itself does not purport to convey the franchise of the ferry, or to vest in the corporation any right appertaining to a ferry. The college was no party to it, and its validity did not depend upon any act of the college. Its assent would not give life to the charter, nor would its dissent defeat it.
If the plaintiffs are the owners of the franchise of the ferry, what will become of their ferry right at the expiration of their charter ? Will they then have a right to put the ferry in operation again, and complain of the old bridge for interfering with these rights ? Their charter answers these inquiries. The bridge will revert to the Commonwealth, and no ferry right can prevent the use of it in such manner as the legislature shall direct. If the plaintiffs had been the proprietors of the ferry, "n accenting the charter of the. bridge they must necessarily *460 have surrendered the franchise of the ferry, or it would have become merged in that of the bridge.
The grant to the plaintiffs was inconsistent with the vested rights of the college, and destructive of their private property. The bridge was to be erected upon the ferry-ways. They both could not exist together. The act of the legislature directly interfered with the use of the franchise of the ferry. But in my opinion it was a justifiable interference. The public exigency required, that the property of the college should be taken for the public accommodation, and a compensation was provided, which the college accepted, and of which they never have complained as being unreasonable or unjust. Perry v. Wilson, 7 Mass. R. 395 ; Stevens v. Middlesex Canal, 12 Mass. R. 468 ; Vanhorne's Lessee v. Dorrance, 2 Dallas, 304 ; Marbury v. Madison, 1 Cranch, 137 ; Wilkinson v. Leland, 2 Peters’s Sup. Ct. R. 627 ; Gardner v. Newburgh, 2 Johns. Ch. R. 168.
When the ferry was established, and for a long time after, it was deemed a mode of conveyance sufficient for the public accommodation. But in about a century and a half the population and business of the two adjoining towns and of the surrounding country, had increased so much as to require a different mode of communication. Although at first the ferry might be deemed adequate to the public wants, yet it soon became obvious, that the time would arrive when public convenience and necessity would demand a more easy mode of transportation. Of the time when such change became necessary, the legislature were the exclusive judges. They have determined it; and of their decision no one has the right, or, so far as I know, the inclination to complain.
I am-therefore of opinion, that the legislature, having rightfully decided that the public exigency required that the franchise of the ferry should be taken, did seize it, after providing a suitable indemnity, not for the purpose of granting the same to the plaintiffs, but to enable them to make a compact by means of which the public wants should be satisfied m a particular in which the ferry was insufficient to answer that purpose.
The charter of the plaintiffs was rightly granted, and con *461 stituted a valid compact between them and the Commonwealth, the import of which we shall hereafter consider. But it seems to me very clear, that there was no contract made by the plaintiffs, to which the college was a party ; nor any other act done by the college whereby they transferred their right to the plaintiffs ; that neither in law nor equity can the plaintiffs be considered the successors or assignees of the college.
But if they were, I cannot perceive how they could support their present bill on the right of the ferry. They never pretended to use the ferry. It has been discontinued for more than forty years. They do not complain of any loss of passengers in their ferry-boats, for they have none. Their ownership of the ferry would not have authorized them to build a bridge. Pain v. Patrick, 3 Mod. 294. Their authority to do this depends upon their charter, and the whole injury of which they complain, is the diversion of travellers from their bridge, and the consequent loss of toll. The plaintiffs must therefore rest the support of their bill solely upon the grant of the legislature to them.
This brings us to the consideration of their charter. By this certain exclusive rights are secured to them, and the question which we are now to consider is the extent of these exclusive rights. I have endeavoured to show, that upon the correct solution of this question the decision of this case must depend.
The act incorporating the proprietors of Charles River bridge was accepted by them. It then became a compact between them and the Commonwealth. Neither party has any right to violate it.
The charter, which was originally limited to forty years, was by a subsequent act extended to seventy. That this extension was fairly and rightfully obtained, has not been questioned by the defendants’ counsel in the present argument. And I have no doubt that it was duly accepted by the plaintiffs, and now gives them the same right which they would have possessed under their charter, had it extended seventy instead of forty years in its commencement. I shall' therefore treat it as a subsisting compact, without reference to the period of its first limitation.
*462 What are the terms of this compact ? The corporation on their part bound themselves to erect and maintain, during the time limited in their charter, a bridge of the description, and according to the terms mentioned in the act, and to pay to Harvard College two hundred pounds annually during the same period. On the other hand, the Commonwealth contracted, that the plaintiffs should have and enjoy during .he same term the benefits and privileges of a corporate body, should hold and manage the bridge then to be erected, with all its privileges and advantages, as corporate property, and should have a right to demand and receive of all passengers over the bridge a specified rate of toll. These are the principal stipulations of the respective parties contained in the charter ; and besides these there are no express covenants on the part of the Commonwealth, bearing upon the question under consideration. There is no warranty that the channels of communication to and from the bridge should remain the same as they then were, or that the public business, legislative or judicial, should continue to be done in the same places it then was, and it is manifest, that any loss of travel by a change in either of these respects would be a damage to the plaintiffs, of which they would have no right to complain.
The plaintiffs are vested with an exclusive right to take the stipulated rate of toll, and the legislature have no constitutional power to reduce, alter or abolish it. But of whom are the plaintiffs entitled to receive this toll ? Is it of all persons having occasion to pass Charles river, or of all persons passing between Charlestown and Boston, or only of such persons as may actually pass over their bridge ?
The right of taking toll is not co-extensive with the river itself, because at the date of the charter there was a bridge at Cambridge, and the charter must be construed with reference to the state of things at that time.
The act of incorporation does not limit the toll to the towns of Boston and Charlestown, nor is there any reference to the travel between those two towns, unless it be in the title of the act. There is no rule in construing statutes better settled, than that the title of an act does not constitute a part of the act. The charter itself does not describe the bridge as be *463 tween Charlestown and Boston, but grants authority to erect “ a bridge over Charles river in the place where the old ferry was then kept.” These towns are not named, except for the purpose of describing the then existing ferry. There are therefore no words used in the charter, limiting the plaintiffs’ right to the travel between those two towns.
The ferry was manifestly referred to for the purpose of fixing the place where the bridge should be located, and not with a view of defining the rights granted to the proprietors.
The inference seems to me to be unavoidable, that the grant must be construed either to vest a right to take toll of all passengers across Charles river below Cambridge bridge, or only a right to take toll of such persons as, under all the changes which the population, business and state of the country might undergo, should choose to pass at this bridge. In other words, that the exclusive right either extends from the mouth of the river to Cambridge bridge, or is limited to the bridge itself. If this be not a necessary alternative, I would inquire what points upon the river above and below the bridge can be fixed upon as the specific boundary of the plaintiffs’ right. I have shown that the limits of the two adjoining towns do not constitute this boundary. It cannot be presumed that the legislature of the Commonwealth would make a grant of a valuable franchise so vague and indefinite in its terms as to be unintelligible ; nor can it be presumed that the grantees - would accept such a grant. The presumption is an impeachment of the discernment and forecast of the corporators as well as of the wisdom of the legislature. By adopting either of these alternatives we have a grant with definite intelligible limits. By rejecting them and seeking some intermediate point, we are left without any guide, and are compelled to depend on conjecture, or general notions of justice or expediency, which will be different in different individuals, to determine the extent of a franchise, which ought to be well defined and certain. If we are necessarily brought to choose between these two alternatives, which shall we adopt ?
In the discussion of this subject, I think much aid may be derived from an examination of the charters of other private corporations. Bank incorporations, though not precisely an *464 alogous, are not entirely dissimilar. They owe and perfora’ onerous duties to the Commonwealth, which form a good consideration for the grants of their charters. They pay a heavy tax to the State, and make loans to it, when required by the legislature, at a lower rate of interest than is taken from othet debtors.
The legislature might for a limited time, and upon propel considerations, grant to a corporation the exclusive right of banking within any town or county or throughout the Commonwealth. And it was once contended by learned and respectable men, that the first bank charter gave this extensive exclusive right. This opinion is undoubtedly an incorrect one, and is now generally exploded. And yet it seems to me, that the grant of a bank in a particular town has some points of similarity to the grant of a bridge across a river at a particular place or between two towns. If new banks are established in the same town or place, the old one suffers perhaps as much by injurious competition, as the proprietors of an old bridge by the erection of a new one across the same river or between the same towns. Some of the arguments in favor of an exclusive right are applicable to both cases. It is however well settled and indisputable, that a bank charter does not contain any restriction upon the legislative power, which will prevent the establishment of rival institutions.
. Turnpike charters are still more analogous. Perhaps it would be difficult to point out the difference between the rights ot bridge and turnpike corporations in this respect. Both are-intended for the public accommodation by furnishing facilities for travel and transportation. The proprietors of both owe similar duties to the public. They are bound to keep them in repair and. convenient for use, and both derive their support from the same source, viz. the tolls which they are authorized to levy. The charters of both ought therefore to be expounded by the same rules of construction.
How far have the proprietors of turnpikes an exclusive right? Is it a violation of their charters for the legislature to grant new turnpikes, or the county commissioners to lay out new roads, which will divert any portion of travel from them ? If so, none of the older turnpike charters are inviolate, and very few of the *465 more recent ones are valid. Scarcely a turnpike has been established in the State since the first, which has not diverted more or less of the travel from the former ones. Are these charters void ? If a very small diversion of travel is not inconsistent with a former charter, how much will it require to render it void ? Will one quarter, or one half, or three quarters do it ? If it is a matter of right founded on contract, the slightest injury is as truly a violation of the contract as the greatest, even the entire destruction of the franchise. In relation to turnpikes, I can see no medium between the smallest diversion of travel, and the limitation of the grant to the turnpike road itself. Either the right is to receive toll of all persons who would pass over the road without any alteration of the public channels of communication, or it is only to take toll of such as may pass under any changes which the progressive improvements of the country may demand. I can entertain no doubt which of the two constructions ought to be adopted. Turnpike charters have received a practical exposition, which, though never sanctioned by judicial authority, has been long acquiesced in, and is believed to be a sound one. In many cases the legislature have established new turnpikes, some nearly parallel with and diverting travel to the injury and some times ruin of former ones. There never has been brought before any judicial tribunal, a question as to the constitutionality of these charters. But many adjudications have been based upon their validity.
There is no contract by the Commonwealth, that no new charter shall be granted, which shall interfere with the business or profits of the old. And the legislature do not limit or restrict the power of their successors in establishing new corporations, whenever in their discretion they shall determine that the public good requires them.
In some cases, charters have been granted for the erection of bridges across rivers, over which none existed before. Does this give an exclusive right to all the travel over such rivers 5 And would the grant of a charter for a new bridge, over the same river, which should divert any travel, however small in amount, violate the first contract ? It manifestly would not. If then a slight diversion of travel would not contravene the *466 first charter, the exclusive right does not extend to the whole travel which would have passed over the first bridge if no new one had been erected. How near then must the new one be, and how much of the travel must it divert, to become a nuisance ? It would, I believe, bé difficult, if not impossible, to give a definite answer to this question.
Does the charter of a bridge or turnpike give to it an exclu sive right to the line of travel which passed over it when first - constructed ? This is an indefinite and uncertain expression, and the line of travel is everywhere very fluctuating. But if it has any certain definition, it must mean the travel from all those parts of the country from which it passed at the time of the completion of the bridge or turnpike. A grant or covenant to this extent would amount to a stipulation, that the channels of communication and course of business, and in fact the state of society and of the country itself, should remain stationary. A change of the roads, the improving of an old, or the laying out of a new one, at a great distance from a bridge or turnpike, might affect the travel over it. The change of business or the opening a new market at one extremity of the State, might diminish the transportation over a bridge or road at the other. I think therefore that the extent of the exclusive right granted is in no case defined or limited by a reference to any particular line of travel.
If every turnpike and bridge charter contains a covenant or stipulation that no new turnpike or other road or bridge shall be made, which will divert the travel or diminish the profits of the old one, then deplorable is the state of almost every incor poration of this kind in the Commonwealth. They have been acting and expending their money on the faith of void charters, and all their acts have been unauthorized, and so far as they interfered with the rights of others, were trespasses upon private property.
If the diversion of toll is inconsistent with an existing charter, it cannot be justified by legislative authority. The act authorizing it would impair the obligation of a contract, and be void by the constitution of the United States. Although the legislature may appropriate private property, may take the whole franchise of a corporation, when the public exigency re *467 quires it, by indemnifying the owners ; yet a contract is deemed sacred, and the constitution nowhere allows the violation of its obligations, by any branch of government, for any exigency or upon making compensation for the injury. The supreme law of the land expressly and peremptorily interdicts the legislatures of the several States from passing any law impairing the obligations of contracts. Any legislative act, assuming the form of law, having this effect, is a nullity and a blank upon the statute book.
If therefore the different private charters in the Commonwealth granted for the purpose of improving the • state of the country and bettering the condition of the people, are to receive the extensive construction contended for, they amount to an entire prohibition of all further internal improvement during their continuance. No improved road, no new bridge, no canal, no railroad can be constitutionally established. For I think, in the present state of our country, no such improved channel of communication can be opened without diminishing the profits of some old corporation.
It is vain to say that the new corporations may proceed in their enterprises of public utility, by paying to the old ones the damages which they sustain. I think I have shown that the diversion of toll is a consequential damage, which cannot be justified under the authority to take private property for public uses, and that if it is inconsistent with the provisions of a former charter, it is void. If I have succeeded in establishing these two propositions, which seem to me to be extremely clear ; then it necessarily follows, that such new corporations can exist only by the consent of the old ones ; and may be restrained from proceeding or declared to be legal nullities, whenever the old corporations whose emoluments are diminished, shall choose to appeal to the equity jurisdiction of this Court.
If, however, such be the necessary and true construction of the charters granted by the legislature, fiat justitia; let the public faith be preserved inviolate ; let the contracts of the government, according to their true import, be rigidly enforced. But if consequences so inconsistent with the improvement and prosperity of the State result from the liberal and extended construction of the charters which have been granted, we ought, *468 if the terms used will admit of it, rather to adopt a more limited and restricted one, than to impute such improvidence to the legislature.
In the further examination of this subject, I am more fully convinced of the correctness of the position which I advanced in relation to the plaintiffs’ charter, viz. that it either gave them the exclusive right to all the travel across Charles river below the Cambridge bridge, in the state in which the channel oí communication between the metropolis and the surrounding country then was, or only the right to take toll of such persons as, under the changing and improving state of our country, should choose to pass their bridge.
If one or the other of these constructions must be the true one, then which shall we adopt ? If the former, then every new bridge across the river, every turnpike and every common highway, which has diverted a traveller from the plaintiffs’ bridge, has been an infringement of their chartered rights, and a violation of public faith. This construction would amount substantially to a covenant, that during the plaintiffs’ charter an important portion of our Commonwealth, as to facilities for travel and transportation, should remain in statu quo. I am on the whole irresistibly brought to the conclusion, that this construction is neither consonant with sound reason, with judicial authorities, with the course of legislation, nor with the principles of our free institutions.
It only remains for me to adopt the latter construction of this grant, and hold, .that the plaintiffs’ right, by virtue of their compact with the Commonwealth, only extends to the taking of toll of such persons as may pass their bridge, and that this compact contains no covenant or agreement that they shall be entitled to a certain extent or particular line of travel.
This manifestly is the literal construction of the act and sat isfies all its words.
The words are, “ that a toll be and hereby is granted • ” For whose benefit ? “For the sole benefit of the proprietors.” Of whom is it to be collected ? Of the passengers or persons passing the bridge. The act contains no covenant or stipulation as to the extent of travel, nor any limitation or restric *469 tion upon subsequent legislatures in relation to other charters or grants.
I have now endeavoured to show, that the act incorporating • the proprietors of Charles River bridge contains no express grant of an exclusive right beyond the limits of the bridge it self, nor any covenant on the part of the Commonwealth, that no new bridge shall be erected which shall diminish the profits of the old one. It only remains for me to consider, whether there is any such grant or covenant by implication.
The general rule is, that in governmental grants nothing passes by implication. Bac. Abr. Prerogative, F 2 ; 17 Vin. Abr. Prerogative., C. c; Blankley v. Winstanley, 3 T. R. 288 ;. The Case of the Royal Fishery of the Banne, Davies, 157 ; Finch’s Law, 100 ; Legates Case, 10 Co. 112 ; The Elsebe, 5 Rob. Adm. R. 162. In England, where such grants emanate from the prerogative of the crown, this rule is well established. “A subject’s grant,” says Blackstone, (2 Com. 248,) “ shall be construed to include many things besides what are expressed, if necessary for the operation of the grant.” “ But the king’s grant shall not enure to any other intent than that which is precisely expressed in the grant.” If this is the rule under a monarchical government and in grants of the king, by much stronger reason ought it to prevail under a republican government and in legislative grants. It is much more applicable to agents of short continuance, than to hereditary officers. The Commonwealth is the grantor, the legislature is the agent, and the grant actually proceeds from the people in their collective sovereign capacity. Private charters are a limitation or restriction of legislative power, and are binding not only upon the legislators who make them, but upon their successors ever after. It is a branch of legislation in which the immediate actors, touching the subject acted upon, exhaust the whole power which has been committed to the legislative department, and thus leave their successors with less of sovereignty than they themselves possessed. I apprehend, however, that in England, and even in this country, the rule cannot be sustained in the full extent in which it is laid down by Blackstone, but must receive some qualification. But that public grants are to be construed more strictly, and less favorably to the grantee than *470 private ones, I believe will admit of no doubt. Blankley v Winstanley, 3 T. R. 279 ; Boulton v. Bull, 2 H. Bl. 500.
Although exclusive rights for short periods sometimes en courage enterprises of public usefulness, yet generally theii tendency is to impede the march of public improvement, and to interrupt that fair and equal competition which it has ever been the policy of our country to encourage. They are not. and never have been, favorites with our government, and are not to be presumed to have been granted farther than the express Words of the grant will warrant.
Although no distinct thing or right will pass by implication, yet I do, not mean to question that the words used should be understood in their most natural and obvious sense, and that whatever is essential to the enjoyment of the thing granted, will be necessarily implied in the grant. Co. Lit. 56 a ; Plowd. 317 ; Saunders’s Case, 5 Co. 12.
The considerations which I have before offered for the purpose of showing that the plaintiffs’ charter ought to receive a strict and limited construction, tend, with equal, perhaps greater force, to prove that it ought not to be extended by implication so as to include the extensive exclusive rights claimed by the plaintiffs.
The authority to build the bridge itself is granted by implication. But it is a necessary implication. Without it, the grant itself would be an absurdity and a nullity. Not so with the rights claimed. This grant was of a franchise. This might be enjoyed under the construction which I hold to be correct, as well as under the more extensive one contended for by the plaintiffs. It is true the franchise would be more valuable under the one construction than the other. But the rule does not apply to the value. The grantees cannot claim any additional privilege or immunity because it will increase the value of the thing granted, but only where it is necessary to the enjoyment of it.
The case of the Portland Bank v. Apthorp, 12 Mass. R. 252, seems to me to be a strong illustration of the principle for which I contend. The Portland bank had a charter for a limited term, containing the powers, duties and liabilities of the corporation. During the continuance of the charter a tax of *471 one per cent per annum on the capital stock was imposed on all the banks in the State. The Portland bank resisted the payment of this tax, on the ground that the law imposing it was inconsistent with their charter, and as to them, inoperative.
They must have contended, and doubtless did, that they acted under a charter which was a contract with the Commonwealth ; that this contract did not require of them the payment of such a tax, but by necessary implication exempted them from till duties not specifically enumerated in the charter ; that they were bound to continue their corporation during the period of its limitation ; that the tax was a heavy burden ; that they might not have accepted their charter with- such a burden ; and that it was a violation of the spirit, if not the letter of their contract, to compel them to perform duties which were not contemplated when they accepted their charter, and from which they could not relieve themselves by a surrender of it.
But these objections to the validity of the tax were overruled, and the Court held, that the charter contained no implied exemption from a general tax, which might be imposed upon any description of property of which they were owners. The legislature did not impose upon themselves any restriction in relation to the taxation of the property in the Commonwealth. And the stockholders accepted their charter with a knowledge of the power of the legislature over these subjects.
In the case before us, the proprietors of Charles River bridge must be presumed to have accepted their charter with an understanding that the legislature possessed the general authority to make laws regulating the navigable waters, the mediums of communication, and many other subjects which might increase or diminish the value or profits of the franchise granted to thém. No restraint upon this authority can be raised by implication. They must therefore have taken their charter subject to this authority, and have relied upon the wisdom and justice of the legislature, and not upon any provisions of their chai ter, to protect them from unjust and unreasonable competition. Whether in this respect they have reason to complain, we have no right to inquire or give an opinion. Our confidence in a co-ordinate branch of the government forbids a pre *472 sumption so inconsistent with its dignity and the respect due to it.
The plaintiffs’ rights cannot be extended by implication beyond what is necessary to the enjoyment of the thing specifically granted, and that there is nothing in the case to favor the doctrine of implied grants or covenants, I think manifest, —
Because the grant was made by agents appointed for short periods and with limited powers : —
Because the grant itself is a restriction upon the power of subsequent legislatures ; —
Because the extension of the grant is in derogation of -the rights and against the interests of the people : —
Because it tends to promote monopolies and exclusive privi.eges, which ever ought to be guarded against and restrained : — and
Because such constructions of existing grants would prove an insuperable obstacle to future improvements.
I am therefore of opinion, that the plaintiffs’ charter does not contain, expressly or impliedly, any such grant or covenant as they contend for.
It may be urged against this construction of the plaintiffs’ and other similar grants, that it will take from the grantees all encouragement to commence hazardous and expensive enterprises for the public benefit.
If I am asked what security they have that their reasonable expectations of remuneration will not be destroyed by the establishment of rival institutions, I answer, that they have security in the self-interest of individuals, who will never engage in expensive works without a prospect of remuneration. Unless it is believed that a new bridge or turnpike will be profitable to ihe proprietors, it will never be made to the injury of the old one. They have security in their confidence in the legislature ; that, in consulting the good of the whole, they will not sacrifice or injure the property of one portion of the community for the benefit of another. And they have still higher security in the constitutional provision, that private property shall not be taken for public uses without a reasonable compensation. No new bridge, turnpike or common highway can be expected to be established without the taking of private *473 property, and therefore no such new channel of communication can be opened, except where public convenience and necessity shall require it. If all these are not sufficient encouragement to public improvements and sufficient security against injurious or destructive competition, then I say that it was the fault of the grantees that they did not make a more favorable bai gain, or that they acceded to an injurious compact. In all cases they may require an express grant of an exclusive right within certain limits, or a clear stipulation that no rival institution shall be authorized within a certain distance. Such provisions are often inserted in charters in neighbouring States, and there has been at least one instance in this Commonwealth. In 1792 the exclusive right, for a limited period, of making a canal between Connecticut river and the metropolis, was granted to a number of individuals who were incorporated.
Although the correct exposition of the contract now under examination is very important to the parties to this suit and to other corporations now in existence, yet it is of little import in relation to the promotion of public enterprise, or in any respect in relation to charters hereafter to be granted. When the construction of this charter is settled, the parties to future ones will take care to insert such express provisions and stipulations as they shall deem promotive of the public good, and secure against any unreasonable private competition.
The duty which we are required to perform in the present case, is the most difficult and important which can fall to the lot of judicial officers. It is to revise, scrutinize and compare with the constitution and decide upon the validity of an act of the legislature of the Commonwealth. For one branch of the government to re-examine the acts of a co-ordinate branch, and determine upon their conformity to the constitution under which both act, and to declare them valid or invalid according to its opinion of such conformity, is a high, delicate and invidious power ; one which will no more be exerted in doubtful, than it will be omitted in clear cases.
The act under consideration, we are bound to presume, received due deliberation from all branches of the legislature. Of the expediency of passing it; of its bearing upon the interests of different individuals, corporations and sections of the *474 Stale ; of the public convenience and necessity which required the seizure of private property, they are the exclusive judges. And we have no more the inclination, than the means, of reexamining any of these questions. But upon its constitutionality we are bound to decide. If it clearly contravenes any constitutional provision, our duty is plain. The act is a nullity. But if this point is doubtful, our reluctance to exert so high and delicate a power, our respect for the legislature, and our confidence in a co-ordinate department of the government, would require us to give validity to its acts. For myself, however, I have no need in the present case to resort to this principle.
From the most thorough and deliberate examination which 1 have been able to give to the present case, I am fully convinced, that the act under which the defendants erected their bridge is not an infringement of the plaintiffs’ rights, and does not violate any provision of the State or national constitution. I am therefore of opinion, that the plaintiffs’ bill ought to be dismissed.

The plan, though perhaps not exact in regard to distances, shows with sufficient accuracy the relative situation of Boston and the several towns, &c bridges and ferries in the vicinity, which are referred to in the case. They are denoted by letters and numbers as follows:—